# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**CHARLES ADAMS, ET AL.**

**VERSUS**

**UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO, LOCAL 198, ET AL.**

**CIVIL ACTION**

**NO. 98-400-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on Defendant United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO, Local 198's ("Defendant" or "Local 198") *Motions for Summary Judgment.* (Docs. 737 and 804). There are 38 Plaintiffs (collectively "Plaintiffs") remaining in this matter.[1] (Doc. 773-1). The first motion for summary judgment was filed on October 31, 2019 ("MSJ 1"), and it applies to 19 Plaintiffs.[2] (Doc. 737). The second motion for summary judgment was filed on February 18, 2020 ("MSJ 2"), and it applies to 19 Plaintiffs.[3] (Doc. 804). Plaintiffs submitted memoranda in opposition to the motions. (Docs. 770, 775, 781, 784, 795, 827, 831, and 842). Defendant replied.

---

[1] The following Plaintiffs have pending claims: Charles Adams; Larry Bell; Yvonne Catherine; Umeca O'Conner; Corey Catherine; Leo Davis; David Dixon; Wayne Dukes; Earnest Ford, Sr.; Lee Fox; Larry Freeman; Kevin Gauthier; Larry Gilmore; Rayfield Goings; John Green; Alfreddie Greensberry; Mannie Henderson; Clyde Holliday; Freddie Jackson; Michael Jackson; Jonas Jacob; Earnest Johnson; Carl Judson; Freddie Judson, Jr.; Kenneth Judson; Michael Kyles; Herbert Lavergne; Roberta McDomic; James Miles; Sam Parker; Lionel Richard; Donald Robertson; Willie Stone; Earl Turner; Alfred Wallace; James White; Derrick Wicker; and Tommie Williams.

[2] MSJ 1 seeks to dismiss the claims of the following Plaintiffs: Larry Bell; Yvonne Catherine; Umeca O'Conner; Corey Catherine; Leo Davis; Wayne Dukes; Earnest Ford, Sr.; Larry Gilmore; Rayfield Goings; Alfreddie Greensberry; Freddie Jackson; Carl Judson; Kenneth Judson; Roberta McDomic; Sam Parker; Willie Stone; Earl Turner; Alfred Wallace; and Derrick Wicker.

[3] MSJ 2 seeks to dismiss the claims of the following Plaintiffs: Charles Adams; David Dixon; Lee Fox; Larry Freeman; Kevin Gauthier; John Green; Mannie Henderson; Clyde Holliday; Michael Jackson; Jonas Jacob; Earnest Johnson; Freddie Judson, Jr.; Michael Kyles; Herbert Lavergne; James Miles; Lionel Richard; Donald Robertson; James White; and Tommie Williams.

(Docs. 786, 789, 800, 810, 833, and 844).  Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.  For the following reasons, Defendant's motions for summary judgment are granted in part and denied in part.

Also before the Court is Plaintiffs' *Motion to Strike*.  (Doc. 793).  Defendant opposed the motion to strike.  (Doc. 801).  For the following reasons, Plaintiffs' motion to strike is denied with prejudice.

## I.    Plaintiffs' Claims and Procedural Background

The original 99 Plaintiffs filed a "Class Action Complaint" on May 1, 1998.  (Doc. 1).  The proposed class of Plaintiffs are all African Americans who: are or have been members of the Local 198; have sought and been denied membership in the Local 198; have been or are currently enrolled in the Local 198's apprenticeship program; or have sought admittance and been denied admission to the Local 198 apprenticeship training program.  (*Id.*, p. 7).  The sole remaining Defendant is Local 198.  Plaintiffs allege that Local 198 discriminates based on race in the following ways: job assignments; job referrals; lay-offs; board leadership; maintaining a hostile work environment; using racial slurs and epithets; training; compensation; hiring; benefits; representation; recalls; job opportunities; retaliation; preventing work in supervisory positions; lack of assistance in disputes and providing defense; and admissions.  (*Id.*, pp. 9-19).

On July 28, 1998, Plaintiffs moved to certify the class.  (Doc. 27).  Magistrate Judge Dalby recommended that the action not be certified as a class action on August 31, 1999.  (Doc. 185).  The Court adopted this recommendation and denied the motion to certify the class on October 29, 1999.  (Doc. 196).

Plaintiffs amended their original complaint on July 27, 2001, adding additional Plaintiffs. (Doc. 227). Two additional amending complaints were filed on December 3, 2001, naming additional Plaintiffs. (Doc. 274 and 283). On February 14, 2002, Plaintiffs amended the complaint again, naming additional Plaintiffs. (Doc. 335). Plaintiffs were added in the amended complaint filed on November 4, 2002. (Doc. 493). A final amended complaint was filed on April 15, 2003, (Doc. 518); however, no new Plaintiffs were named in the final amendment.

This case arises out of Local 198's alleged violations of: (1) the Civil Rights Act of 1866 pursuant to 42 U.S.C. § 1981 ("Section 1981 claims"); (2) Louisiana state law for acts of racial discrimination pursuant to La. Rev. Stat. 23:332(C)(1) and (2) and (D) ("discrimination claims under state law"); (3) Louisiana state law for acts of negligence, gross negligence and/or willful and wanton negligence ("negligence claims"); and (4) Title VII of the Civil Rights Act of 1964 pursuant to 42 U.S.C. § 2000e ("Title VII claims"). Defendant's motions seek to dismiss Plaintiffs' Section 1981 claims, discrimination claims under state law, and Title VII claims. Defendant does not address Plaintiffs' negligence claims; therefore, the negligence claims are not presently before the Court and will remain pending.

## II.    Relevant Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts … [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citations omitted). The non-mover's

burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(citations and internal quotations omitted). The party opposing the motion for summary judgment may not sit on his hands, complacently relying on the pleadings. *Weyant v. Acceptance Ins. Co.*, 917 F.2d 209 (5th Cir. 1990). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. General allegations that fail to reveal detailed and precise facts will not prevent the award of summary judgment. *Walton v. Alexander*, 20 F.3d 1350, 1352 (5th Cir. 1994). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's Inc*., 939 F.2d 1257, 1263 (5th Cir. 1991).

## III.    Discussion

### A.    Parties' Arguments

#### 1.    Defendant's Memoranda in Support (Docs. 737-2 and 804-1)

Defendant's motions are premised on the same basic tenet: when Plaintiffs filed their complaint, they alleged an "array of discriminatory conduct", but they did not specify which Plaintiffs experienced what conduct. (Doc. 737-2, p. 8). Although Plaintiffs amended their complaint numerous times, Defendant claims that they did not allege additional facts, rendering the complaint lacking in specificity as to each Plaintiff and his/her personal experience. (*Id*.). Indeed, Defendant alleges that Plaintiffs do not satisfy the requirements of pleading under Rule 8. (*Id*., n. 6).

Defendant also argues that Plaintiffs' claims should be dismissed on numerous other grounds: untimeliness, (*id.*, p. 9); failure to state a claim against Local 198 as Plaintiffs' complaints are regarding employers and contractors outside the agency of Local 198, (*id.*); and/or a failure to allege or show disparate impact in order to prove his/her discrimination claim, (*id.*). Defendant then organizes its arguments into four groups: (1) the acts of other entities or individuals for whom Local 198 cannot be found liable, (*id.*, pp. 11-17); (2) allegations for which there is no evidentiary support or legal basis, (*id.*, pp. 17-23); (3) "invalid" Title VII claims, (*id.*, pp. 23-25); and (4) no factual basis or genuine issue for trial, (*id.*, pp. 25-46).

### a. Other Entities

Defendant argues that it is not liable for the acts taken by the Education Fund. (*Id.*, p. 11). The Education Fund is the apprenticeship program for Local 198. (*Id.*). Defendant argues that the Education Fund is a separate entity "whose funds are held in trust" and which is run by its own Board of Trustees. (*Id.*, p. 12). After serving one year in the apprenticeship program, individuals are eligible to join Local 198. (*Id.*). Defendant contends that any complaints about the apprenticeship program should be dismissed because Local 198 is not responsible for those complaints, only the Education Fund is. (*Id.*, pp. 12-13). The Education Fund is not a named Defendant.

Next, Defendant argues that it is not liable for the "unauthorized acts" of its individual union members. (*Id.*, p. 13). For example, "some" of the members of Local 198 are trustees for or are employed by the Education Fund. Defendant argues that Local 198 is not liable for any actions taken by these members in those capacities because these acts are separate and apart from Local 198. (*Id.*).

Defendant also argues that it is not liable for the actions of "other employers". (*Id*.). Many Plaintiffs complain of discriminatory treatment or adverse working conditions on work sites. Defendant contends that only the particular contractor or employer has control of its work site, and it is that employer's actions about which Plaintiffs complain, not Local 198. Therefore, Defendant cannot be found liable for those complaints, if proven. (*Id*., pp. 14-17).

> b.     *No Evidentiary Support or Legal Basis*

Defendant argues that Local 198 is not liable for the "call-out", "recall" or "call-back" process. (*Id*., p. 17). This process is set out in the collective bargaining agreements, and it allows the contractor or employer to "call for" a specific worker by name. (*Id.*). Plaintiffs claim that this process was applied in a discriminatory manner. (*Id*., citing Doc. 648, p. 2). Defendant argues that there is no evidence or sufficient factual allegations to support this claim, only "baseless conjectures". (*Id*., pp. 19, 20).

Next, when any union is unable to fill a job with workers from its own union, it may reach out to other jurisdictions to fill the job with other workers. (*Id*., p. 22). Local 198 kept an informal list of members who expressed an interest in out-of-town work. Those members were contacted when Local 198 was aware of a need. This process is called "referrals". (*Id*.). "Many" Plaintiffs claim that Defendant discriminated in how it administered referrals. Defendant argues that there is "not a shred of evidence to support these baseless suspicions". (*Id*.).

Defendant then argues that Plaintiffs' "miscellaneous" claims or "dashed expectations" should be dismissed for lack of factual allegations to support these claims. (*Id.*, pp. 22-23).

> c.     *"Invalid" Title VII Claims*

The third group of arguments is based upon the premise that Plaintiffs do not present "valid" Title VII claims. (*Id*., p. 23). Plaintiffs filed their initial complaint on May 1, 1998,

alleging that Plaintiffs filed a charge with the EEOC and that Plaintiffs would amend the complaint

to seek damages under Title VII once the EEOC issued right to sue letters. (Doc. 1, ¶ 86). Plaintiffs

sought leave of court to amend the complaint on March 21, 2001, attempting to assert claims under

Title VII because the right to sue letters were issued; however, this amendment was withdrawn.

(Docs. 208 and 224). On July 27, 2001, Plaintiffs sought leave of court to amend their complaint

a second time; however, Defendant claims the record does not reflect that leave of court was

granted. (Doc. 227). Defendant contends that Plaintiffs withdrew the "second" amended

complaint within the "fifth" amended complaint. (Doc. 737-2, p. 24). A "fourth" and "fifth"

amended complaint were filed on December 3, 2001. (Docs. 274 and 283). There is no "third"

amended complaint. In the "fifth" amended complaint, Plaintiffs repeat the same language as is

contained in the initial complaint regarding an *intention* to later amend and assert claims under

Title VII. (Doc. 283, ¶ 85). Defendant argues that none of the Title VII claims are "actionable"

because no Plaintiff filed a complaint alleging Title VII claims within 90 days of receipt of a right

to sue letter and because no Plaintiff has properly alleged a valid Title VII claim. (Doc. 737-2, p.

25).

### d.    No Individual Basis for Claims

The final group of arguments is dedicated to the Plaintiffs "who cannot come forward with

a legal and timely factual basis for their lawsuit". (*Id.*). Defendant then addresses each Plaintiff

individually.[4]

---

[4] MSJ 1 addresses: Larry Bell, (Doc. 737-2, pp. 25-27); Frank Cage, (*id.*, pp. 27-28); all heirs of Joseph Catherine, (*id.*, pp. 28-30); Joseph Collins, (*id.*, pp. 30-31); Leo Davis, (*id.*, pp. 31-32); Wayne Dukes, (*id.*, pp. 32-33); Earnest Ford, (*id.*, pp. 33-34); Larry Gilmore, (*id.*, pp. 34-35); Rayfield Goings, (*id.*, pp. 35-36); Alfreddie Greensberry, (*id.*, pp. 36-37); Freddie Jackson, (*id.*, pp. 37-38); Carl Judson, (*id.*, pp. 38-39); Kenneth Judson, (*id.*, pp. 39-40); Roberta McDomic, (*id.*, pp. 40-41); Ivan Morgan, (*id.*, p. 41); Sam Parker, (*id.*, pp. 41-42); Willie Stone, (*id.*, pp. 42-43); Earl Turner, (*id.*, pp. 43-45); Alfred Wallace, (*id.*, p. 45); and Derrick Wicker, (*id.*, pp. 45-46). MSJ 2 addresses: Charles Adams, (Doc. 804-1, pp. 10-12); David Dixon, (*id.*, pp. 12-14); Lee Fox, (*id.*, pp. 15-17); Larry Freeman, (*id.*, pp. 17-19); Kevin Gauthier, (*id.*, pp. 19-20); John Green, (*id.*, pp. 20-22); Mannie Henderson, (*id.*, pp. 22-24); Clyde Holliday, (*id.*, pp. 25-26); Michael Jackson, (*id.*, pp. 26-27); Jonas Jacob, (*id.*, pp. 27-29); Earnest Johnson, (*id.*, pp. 29-30);

2.    **Plaintiffs' Oppositions (Docs. 770, 775, 781, 784, 795, 825, 827, 831, and 842)[5]**

Plaintiffs organize their opposition, (Doc. 770), into several groups: (1) disparate treatment and disparate impact, (*id.*, pp. 2-17); (2) liability for discrimination "in the Apprenticeship Program", (*id.*, pp. 17-20); (3) responsibility for acts of union members, (*id.*, pp. 20-23); (4) responsibility for "employer agent actions", (*id.*, pp. 23-28); (5) no requirement to file a grievance, (*id.*, pp. 28-30); (6) lack of evidence, (*id.*, pp. 30-32); (7) discrimination in the work place and hostile work environment, (*id.*, p. 32); (8) failure to implement procedures or implementation of procedures in a discriminatory manner, (*id.*, pp. 32-35); (9) dashed expectations, (*id.*, p. 35); and (10) each Plaintiff is addressed individually, (*id.*, pp. 35-56).

Plaintiffs Larry Gilmore, Alfreddie Greensberry, Carl Judson, and Roberta McDomic (the "Wilson Plaintiffs") concede that Defendant is not liable for any acts of the Education Fund, individual workplace actions of union members, actions taken by employer agents, hostile work environments, implementing neutral "call by name" procedures, or for "dashed expectations". The Wilson Plaintiffs specifically reserve all claims of discrimination related to "call[-]outs, call[-]backs, work orders, and … assignment of work". (Doc. 781, p. 2).

a.    *Disparate Treatment and Disparate Impact*

Plaintiffs adopt their arguments and affidavits previously submitted, (Doc. 648), in opposition to Defendant's motion on timeliness. (Doc. 770, pp. 2-3). Plaintiffs list 45 instances of disparate treatment or disparate impact and cite to purported evidence of this discriminatory

---

Freddie Judson, Jr., (*id.*, pp. 30-31); Michael Kyles, (*id.*, pp. 31-33); Herbert Lavergne, (*id.*, pp. 33-36); James Miles, (*id.*, pp. 36-39); Lionel Richard, (*id.*, pp. 39-41); Donald Robertson, (*id.*, pp. 41-42); James White, (*id.*, pp. 42-43); and Tommy Williams, (*id.*, pp. 44-45).
[5] Plaintiffs' first memorandum in opposition to Defendant's motion addresses the general arguments of untimeliness, failure to state a claim, and lack of factual or legal basis to support a claim. (Doc. 770, p. 2). Plaintiffs chose to address the "timeliness of the Title VII claims" in a separate brief. (*Id.*, n. 2).

behavior by Local 198.  (*Id.*, pp. 3-10).  For example, Plaintiffs state, "Defendant, Local 198, segregates job assignments by race," citing to the deposition testimony of Plaintiff John Green, (*id.*, p. 3),  and that "Defendant, Local 198, maintains an executive board that refuses to appoint African American individuals to non-elected positions," citing to deposition testimony of Plaintiff James Miles.  (*Id.*, p. 4).  Plaintiffs provide no legal authority or analysis applicable to these 45 instances of alleged disparate treatment or disparate impact.  Plaintiffs then highlight the testimony of four Plaintiffs, again with no context, legal authority or legal analysis.  (*Id.*, pp. 10-17).

> b.      *The Apprenticeship Program*

Plaintiffs admit in a single sentence that "Local 198 is not liable for discrimination in the Apprenticeship Program".  (*Id.*, p. 17).  However, Plaintiffs criticize Defendant for seeking the "dismissal of allegations" from the complaint "regarding the Apprenticeship School" without citing to the paragraphs in the complaint that Defendant "is seeking to strike".  (*Id.*, p. 17).  Plaintiffs then string together pages of citations to excerpts of deposition testimony to conclude that disputed issues of material fact "preclude summary judgment finding that the Local 198 does not run the Apprenticeship School".  (*Id.*, pp. 19-20).  No legal authority or legal argument is provided.

> c.      *Acts of Union Members*

Plaintiffs approach Defendant's argument that it is not liable for the unauthorized acts of union members in a similar manner.  Plaintiffs again complain of a lack of a citation to the paragraphs in the complaint that Defendant seeks to strike and cite to various affidavits and deposition excerpts to purportedly show that "discriminatory acts were being taken by the Local 198 leadership".  For example, Plaintiffs state that Plaintiff Larry Bell "confirmed" that Louis

LeBlanc was a "known member of the KKK leadership". (*Id.*, p. 20). Again, no legal authority or analysis is provided.

### d.    Employer Agent Actions

Plaintiffs take the same approach with regard to Defendant not being responsible for employer agent actions. (*Id.*, pp. 23-28). Plaintiffs conclude that the "summary judgment lacks merit as it was the Local 198 that was fully invested in the discrimination". (*Id.*, p. 28).

### e.    Grievance Procedure

Plaintiffs oppose Defendant's argument that members of Local 198 must file a grievance prior to pursuing a claim of discrimination, again arguing that Defendant does not cite to the paragraphs of the complaint that it seeks to strike. (*Id.*, p. 28). Plaintiffs also argue that all foremen and stewards on jobs were appointed by Defendant and were the first workers assigned to jobs. Because these foremen and stewards, appointed by Defendant, were then responsible for call-outs, the alleged discrimination in choosing workers for call-outs can be attributed to Defendant. (*Id.*). Plaintiffs conclude their argument by stating that summary judgment should be denied. (*Id.*, p. 30). No legal authority or argument is offered in support.

### f.    Lack of Evidence

Plaintiffs argue that "there is ample evidence in this record that not only was the call-out or call-back designed to have a discriminatory impact in [a] historically white work force, it was implemented in a discriminatory manner and resulted in a disparate impact." (*Id.*). Plaintiffs point to six affidavits offered with their opposition as evidence of this alleged discrimination. (*Id.*).

### g.    Hostile Work Environment

Plaintiffs claim that the hostile work environment was "already briefed" and summary judgment should be denied. (*Id.*, p. 32).

### h.   Failure to Implement/Discriminatory Procedures

The call-out and call-back procedure explained above was not implemented as written and was administered in a discriminatory manner according to Plaintiffs.  (*Id*.).  Plaintiffs claim that disparate treatment and impact were "previously briefed" and refer the Court to Docs. 88, 89, 183, and 285.  (*Id.*, p. 33).  Plaintiffs conclude that this Court "should deny summary judgment finding the Local 198 was implementing facially neutral procedures" in a discriminatory manner.

### i.   Dashed Expectations

Plaintiffs simply ask the Court to deny Defendant's motion regarding claims of "dashed expectations" or miscellaneous claims because Defendant "does not say what those are".  (*Id.*, p. 35).

### j.   Individual Plaintiffs

Plaintiffs argue why each Plaintiff's claims should not be dismissed on summary judgment.  (*Id.*, pp. 35-56).  These specific arguments are addressed below.

### k.   Title VII claims

Plaintiffs opposed Defendant's motion regarding Title VII claims separately.  (Doc. 775).  Plaintiffs argue that their filing on December 3, 2001, which was the "fifth" amending complaint, was not untimely.  (*Id*., p. 2).  First, Plaintiffs point to their first attempt to amend the complaint on March 21, 2001.  Plaintiffs claim that right to sue letters, dated March 3, 2001, were received less than 90 days before the filing.  (*Id*.).  Plaintiffs highlight that Defendant acknowledged notice of Plaintiffs' intention to timely assert their Title VII claims based on the right to sue letters when Defendant opposed Plaintiffs' motion to amend the complaint.  (*Id.*, pp. 2-3).  Relying upon *Singleton v. Westminster Mgmt. Corp*., 1988 WL 15560, *1-2 (E.D. La. Feb. 24, 1988), Plaintiffs argue that its motion for leave of court seeking to amend the complaint and its "attached right to

sue letters" relate back to the filing of the original complaint, which clearly put Defendant on notice of Plaintiffs' Title VII claims. (*Id.*, pp. 3-4). Plaintiffs admit that the motion for leave to amend the complaint was "withdrawn and dismissed as moot". (*Id.*, p. 4, citing Doc. 224). However, Plaintiffs quote the Court's Order that "Plaintiff[s] shall name all plaintiffs by this date [July 27, 2001] and shall indicate those plaintiffs either who have received their right to sue letters or have claims then pending before the EEOC. The deadline for previously named plaintiffs to perfect those claims which were pending before the EEOC by filing an amended and supplemental complaint is August 27, 2001." (*Id.*, p. 5, citing Doc. 224).

Following the Court's Order, Plaintiffs filed an amended complaint on July 27, 2001. Newly-named Plaintiffs averred whether or not they received a right to sue letter. Previously-named Plaintiffs "pled exhaustion, [r]elation back" and "under Rule 15", Plaintiffs argue that this "satisfied" the Order and requirements of Rule 15. (*Id.*, p. 5). Plaintiffs argue that Defendant sought to strike the amended complaint on August 13, 2001, but this motion was denied on December 3, 2001. (*Id.*). Because the motion to strike was denied, Plaintiffs claim that Defendant should have answered the amended complaint by August 6, 2001, which it did not do, thereby waiving any affirmative defenses to the amended complaint. (*Id.*, pp. 5-6). Plaintiffs seem to "split hairs" in contesting that they withdrew the amended complaint in their "fifth" amended complaint by arguing that the withdrawal was not contained in the motion for leave of court to file the "fifth" amended complaint or in the corresponding order; therefore, it was "never ordered". However, Plaintiffs acknowledge that the reference to the withdrawal is contained in the prayer of the actual "fifth" amended complaint; therefore, the Court never entered a formal order allowing for the withdrawal. (*Id.*, p. 6).

Plaintiffs contend that their July 27, 2001, filing and December 3, 2001, filings relate back to the filing of the original complaint. (*Id.*, p. 7). Defendant should not be allowed to rely upon a "technicality" with regard to the dates of the right to sue letters and the pleading of the Title VII claims. Plaintiffs claim that the "piggy-back" rule and "relation back" render Plaintiffs' Title VII claims timely as Defendant was on notice. (*Id.*, pp. 7-8). Plaintiffs acknowledge that the exhaustion of the Title VII claims "was not specifically pled through an amendment". (*Id.*, p. 8).

### 3.    Defendant's Replies (Doc. 786, 789, 800, 810, and 844)

In reply, Defendant highlights that no Plaintiff provided a "specific *prima facie* case of discrimination and the evidence that supports it". (Doc. 786, p. 1). Certain Plaintiffs "never even explain exactly what they are claiming but instead leave that to the Court to figure out." (*Id.*, p. 2). The evidence and briefing offered by Plaintiffs does not "show how they relate to a particular claim of any individual plaintiff". (*Id.*).

Defendant offered the testimony of Louis LeBlanc, James Womack, and Sammy Graphia to support its position that the Education Fund is a separate entity from Local 198 and that Local 198 is not responsible for any acts of the Education Fund. In reply, Defendant also offers the testimony of Neal Paul Miller "to meet some of the objections raised by [P]laintiffs' objections to Mr. LeBlanc's declaration". (*Id.*, p. 7). Defendant argues that Plaintiffs have the burden of proof and offer no evidence that Defendant "has any responsibility for the Local 198 Education Fund" or that the Education Fund discriminated against any Plaintiff. (*Id.*, p. 8).

Defendant argues that Plaintiffs only offer assumptions that are not fact-based in support of their claim that the call-out or recall procedure was discriminatory. Defendant suggests that Plaintiffs could have deposed or sought records from the contractors to show that Defendant controlled who was called for work, but Plaintiffs did not do that. Instead, Defendant has offered

13

affidavit testimony as evidence that the names of workers came from the contractors, not from Local 198. Further, Plaintiffs' argument that there was a disparate impact in the call-out procedure should only apply to those Plaintiffs with claims under Title VII because the remaining bases for claims under state law and Section 1981 requires a showing of intentional discrimination, not disparate impact. (*Id.*, p. 10).

Regarding the timeliness of Plaintiffs' Title VII claims, Defendant first argues that Paragraph 86 of the original complaint states that the Plaintiffs have filed a charge with the EEOC and intend to amend the complaint once right to sue letters are received. However, to date, no charges dated from 1998 or earlier have been produced. Therefore, it was erroneous for the Plaintiffs to plead that the Plaintiffs filed a charge as of May 1, 1998. (*Id.*, p. 11). The same language was contained in the first amended complaint filed on March 23, 2001, which was withdrawn. (*Id.*). The second amended complaint filed on July 27, 2001, states that five Plaintiffs received their right to sue letters: Charles Adams, David Dixon, Lee Fox, James Miles, and Derrick Wicker. (*Id.*). Defendant argues that Adams' letter was mailed November 8, 2000, and the other four Plaintiffs' letters were mailed on March 9, 2001. (*Id.*, pp. 11-12). Defendant maintains that the second amended complaint was withdrawn by the "fifth" amended complaint, and the "fifth" amended complaint alleges that six Plaintiffs had received right to sue letters: Charles Adams, David Dixon, Kevin Gauthier, Lee Fox, James Miles, and Derrick Wicker. (*Id.*, p. 12).

Defendant refutes that it was "on notice" of the Title VII claims and that all Plaintiffs' Title VII claims relate back to the original complaint. In support of this, Defendant argues that it was only on notice of charges that were filed "before" May 1, 1998. Defendant then characterizes Plaintiffs' practice and pleading as "confusing". (*Id.*).

Aside from the timeliness or untimeliness of Plaintiffs' Title VII claims, Defendant argues that there is "no substantive support" for their claims. (*Id.*). Defendant seems to put aside the argument of *timeliness* of Plaintiffs' Title VII claims to argue that there is no evidence of proper *pleading* of a substantive claim under Title VII, regardless if each Plaintiff is allowed to piggyback upon a timely Title VII claim or not. Further, all of Plaintiffs' arguments are framed as if this is a class action, not "39 individual Plaintiffs" with their own individual claims. (*Id.*, p. 14).

### B.      Applicable Legal Authority

"The analysis of discrimination claims under Section 1981 is identical to the analysis of Title VII claims." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017). The only "substantive differences between the two statutes [is] their respective statute of limitations and the requirement under Title VII that the employee exhaust administrative remedies." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). Therefore, the Court analyzes these claims jointly. Likewise, because Louisiana's discrimination law mirrors federal law, Plaintiffs' discrimination claims under state law are analyzed in accord with their claims under Section 1981 and Title VII. *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007).

### 1.      Pattern or Practice

Plaintiffs allege that Defendant engaged in a pattern or practice of racial discrimination under Title VII. Although Plaintiffs initially instituted suit as a class action, the class was not certified, and the Plaintiffs proceeded forward with a series of individual claims. Therefore, the *McDonnell Douglas* burden-shifting scheme applies in analyzing Plaintiffs' claims on summary judgment.

The "pattern and practice" mode of proof for racial discrimination claims recognized in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358–59, 97 S.Ct. 1843,

15

1866–67, 52 L.Ed.2d 396 (1977), does not apply to these claims. A pattern or practice case is not a separate and free-standing cause of action (as Plaintiffs seem to allege) but is really "merely another method by which disparate treatment can be shown." *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1219 (5th Cir. 1995). The typical pattern or practice discrimination case is brought either by the government or as a class action to establish "that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters,* 431 U.S. at 360, 97 S.Ct. 1843.

The pattern and practice method of proof is almost exclusively used in class actions, with individual racial discrimination plaintiffs confined to the *McDonnell Douglas* framework. *Scarlett v. Seaboard Coast Line R.R. Co.,* 676 F.2d 1043, 1053 (5th Cir. 1982) ("This is not a 'pattern and practice suit' by the government ... [n]or is this a private class action … [a]n individual proceeding as an individual under Title VII must prove the elements of a discriminatory hiring claim as set forth in *McDonnell Douglas*."). The Supreme Court has never applied the *Teamsters* method of proof in a private, non-class suit and has recognized the distinction between individual racial discrimination claims and class actions:

> The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest. The inquiry regarding an individual's claim is the reason for a particular employment decision, while at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.

*Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 2799–2800, 81 L.Ed.2d 718 (1984).

Therefore, courts have concluded that the pattern and practice method of proof may not be used in private non-class suits. *See, e.g., Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 760 (4th Cir. 1998), *vac. on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999);

*Babrocky v. Jewel Food Co.,* 773 F.2d 857, 866–67 n. 6 (7th Cir. 1985) ("Plaintiffs' use of 'pattern-or-practice' language also seems to be misplaced, since such suits, by their very nature, involve claims of classwide discrimination, and the five plaintiffs, while attacking policies that would have affected all of Jewel's women employees as a class, have stated only their individual claims, not a class action.") (citations omitted); *Axel v. Apfel,* 2000 WL 1593446, *6 (D.Md. 2000); *Herendeen v. Mich. State Police,* 39 F.Supp.2d 899, 905 (W.D. Mich.1999). The Fifth Circuit's precedents support excluding the use of the *Teamsters* method of proof in a private, individual racial discrimination suit. *Scarlett,* 676 F.2d at 1053; *Mooney,* 54 F.3d at 1219–20 (upholding lower court's rejection of "pattern or practice" instruction because individual plaintiffs failed to show they were entitled to such an instruction). *Celestine v. Petroleos de Venezuella SA, (Celestine I), 266 F.3d 343,* 356 (5th Cir. 2001), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), *citing Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) (where class action status was denied, district court did not err in refusing to give a pattern or practice charge based on precedents). The "pattern-or-practice method of proof [is] not available in private, non-class action lawsuits," and it is not a separate cause of action. *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003); *see also Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 407–08 (5th Cir. 2016) (same), *cert. denied*, 137 S. Ct. 820 (2017).

## 2.    Exhaustion of Administrative Remedies

Under Title VII, "[a] private plaintiff must exhaust [his] administrative remedies by timely filing a charge with the EEOC and receiving a right-to-sue notice before seeking relief from the Court." *Williams v. Louisiana*, CV 14–00154–BAJ–RLB, 2015 WL 5318945, at *3 (M.D. La. Sept. 11, 2015) (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir.2002); 42 U.S.C. § 2000e–5(f)(1)). Generally, "[a] charge under [Title VII] shall be filed within one hundred

and eighty days after the alleged unlawful employment practice occurred[.]" 42 U.S.C. § 2000e–5(e)(1). However, the "time period is extended to 300 days if 'the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice[,]' " such as Louisiana. *Conner v. Louisiana Dep't of Health & Hospitals*, 247 F. App'x 480, 481 (5th Cir.2007).

The Fifth Circuit has explained the Title VII exhaustion requirement as follows:

The scope of the exhaustion requirement has been defined in light of two competing Title VII policies that it furthers. On the one hand, because "the provisions of Title VII were not designed for the sophisticated," and because most complaints are initiated *pro se*, the scope of an EEOC complaint should be construed liberally. On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in attempt to achieve non-judicial resolution of employment discrimination claims. Indeed, "[a] less exacting rule would also circumvent the statutory scheme, since Title VII clearly contemplates that no issue will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance." With that balance in mind, this court interprets what is properly embraced in review of a Title VII claim somewhat broadly, not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which "can reasonably be expected to grow out of the charge of discrimination." We engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label.

*Pacheco v. Mineta*, 448 F.3d 783, 788–89 (5th Cir. 2006) (internal citations omitted).

Further, as it relates to hostile work environment claims, the Fifth Circuit has explained:

Ordinarily, an employee may not base a Title VII claim on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not "reasonably be expected to grow out of the charge of discrimination." [*Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir.2006)] (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970)). The purpose of this exhaustion doctrine is to facilitate the administrative agency's investigation and conciliatory functions and to recognize its role as primary enforcer of anti-discrimination laws. In hostile work environment claims, however, if one act alleged to have created the hostile environment is timely exhausted, "a court may consider 'the entire scope of the hostile work environment claim.' " *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir.2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,

18

105, 122 S.Ct. 2061, 2068, 153 L.Ed.2d 106 (2002)). To apply this "continuing violation doctrine ... the plaintiff must demonstrate that the separate acts are related." *Id.*

*Filer v. Donley*, 690 F.3d 643, 647 (5th Cir. 2012).

Finally, this Court has previously explained:

The Fifth Circuit ... [does] "not require that a Title VII plaintiff check a certain box or recite a specific incantation to exhaust his or her administrative remedies before the proper agency." Nor does it "require, for purposes of exhaustion, that a plaintiff allege a prima facie case before the EEOC." "Instead, the plaintiff's administrative charge will be read somewhat broadly, in a fact-specific inquiry into what EEOC investigations it can reasonably be expected to trigger."

*Martin v. Winn–Dixie Louisiana, Inc.*, No. 3:13–CV–00682–JWD, 2015 WL 1281943, at *6 (M.D.La. Mar. 20, 2015) (citing *Jeavons v. Exxon Mobil Corp.*, No. CIV.A. 13–753–JJB, 2014 WL 897425, at *2 (M.D.La. Mar. 5, 2014) (quoting *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir.2006))).

### 3.    Continuing Tort/Continuing Violation Exception

"Under Louisiana law, '[w]hen tortious conduct and resulting damages are of a continuing nature, prescription does not begin until the conduct causing the damages is abated.'  For the continuous tort doctrine to apply, 'the operating cause of the injury [must] be a continuous one which results in continuous damages.'  It does not apply if 'the complained of actions by the defendant were simply the continued ill effects that arose from a single tortious act.'" *Williams v. Otis Elevator Co.*, 557 Fed. App'x. 299, 301-02 (5th Cir. 2014) (quoting *First Nat'l Bank v. Smith*, 29-350, p. 4 (La.App. 2 Cir. 4/2//97); 691 So.2d 355, 358; *Crump v. Sabine River Auth.*, 98-2326, p. 7 (La.6/29/99); 737 So.2d 720, 726; *Cooper v. La. Dep't of Pub. Works*, 03-1074, p. 6 (La.App. 3 Cir. 3/3/04); 870 So.2d 315, 323 (citing *Crump*, 737 So.2d at 728-29)).

19

"The continuing violation theory typically applies to hostile work environment claims." *Notariano v. Tangipahoa Par. Sch. Bd*., 266 F.Supp.3d 919, 924 (E.D. La. 2017), *reconsideration denied*, No. CV 16-17832, 2018 WL 117 2959 (E.D. La. Mar. 6, 2018) (citing *Johnson v. Fluor Corp*., 181 F.Supp.3d 325 (M.D. La. 2016)). "'Unlike in a case alleging discrete violations, a hostile environment plaintiff is not limited to filing suit on events that fall within this statutory time period because her claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice.'" *Id*. (quoting *Johnson*, 181 F.Supp.3d 325). "'A continuing violation involves repeated conduct and cannot be said to occur on any particular day. It instead occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Id*. (quoting *Jurach v. Safety Vision, LLC*, 72 F.Supp.3d 698, 707 (S.D. Tex. 2014), aff'd, 642 Fed. App'x. 313 (5th Cir. 2016) (internal quotations omitted)).

The Fifth Circuit has explained the continuing violations doctrine this way:

> [The Fifth Circuit] has consistently held that the continuing violations doctrine is equitable in nature and extends the limitations period on otherwise time barred claims only when the unlawful employment practice manifests itself over time, rather than as a series of discrete acts. *Frank v. Xerox Corp*., 347 F.3d 130, 136 (5th Cir. 2003); *see also Huckabay v. Moore*, 142 F.3d 233, 238-39 (5th Cir. 1998). Under the continuing violations doctrine, a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period, if the plaintiff can show a series of related acts, *one or more of which falls within the limitations period*. *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002) (citing *Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997) (emphasis added)). The end goal of the continuing violation theory is to 'accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period *into the statutory limitations period*, so that all of the discriminated acts committed as part of this pattern or policy can be considered timely.' *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001) (emphasis added); *see also Hardin v. S.C. Johnson & Son Inc.,* 167 F.3d 340, 344 (7th Cir. 1999).

*Pegram v. Honeywell, Inc*., 361 F.3d 272, 279 (5th Cir. 2004)(emphasis added).

As the Eastern District has explained:

There are several limits on the applicability of the continuing violations doctrine, including:

(1) the plaintiff must demonstrate that the separate acts are related; (2) the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it; and (3) the doctrine may be tempered by the court's equitable powers, which must be exercised to 'honor Title VII's remedial purpose without negating the particular purpose of the filing requirement.'

*Notariano*, 266 F.Supp.3d at 924 (quoting *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 738 (5th Cir. 2017), as revised (Mar. 13, 2017)).

Moreover, as this Court has explained:

This 'doctrine does not automatically attach in hostile work environment cases, and the burden remains on the employee to demonstrate an organized scheme led to and included the present violation.' *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001) (citing *Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997)) (emphasis added). Further, the doctrine 'requires the same type of discriminatory acts to occur both inside and outside the limitations period,' such that a valid connection exists between them. *Id.* (quoting *Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir. 2000)).

*Price v. PCS Nitrogen Fertilizer, L.P.*, Civ. A. No. 03-153-RET-DLD, 2010 WL 1005181, at *4 (M.D. La. Mar. 15, 2010).

"Discrete adverse actions, although racially motivated, cannot be lumped together with the day-to-day pattern of racial harassment and therefore, if otherwise untimely, cannot be saved by the continuing violation doctrine." *Boyd v. Trinity Industries, Inc*., CIV.A. 14-00469-SDD, 2015 WL 3969464, at *2 (M.D. La. June 30, 2015) (citing *Mayes v. Office Depot, Inc*., 292 F.Supp.2d 878, 888 (W.D. La. 2003)); *see also Pegram*, 361 F.3d at 280.

The Fifth Circuit has held "that a 'three-year break' will defeat any attempt to establish a continuing violation." *Butler v. MBNA Tech., Inc.*, 111 Fed. App'x. 230, 234 (5th Cir. 2004) (citing *Felton*, 315 F.3d at 486).

### 4.    "Single File" or "Piggyback" Rule/Exception[6]

The Fifth Circuit Court of Appeals explained the "single file" or "piggybacking" rule as follows:

> [The Fifth Circuit] ha[s] recognized that '[i]t would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with the EEOC. If it is impossible to reach a settlement with one discriminatee, what reason would there be to assume the next one would be successful[?]' One such situation in which [the Fifth Circuit] ha[s] relaxed the Title VII filing requirement arises when a non-filing party wishes to piggyback his judicial action on the claim of a party who followed the administrative procedures. This Circuit has held that 'in an action involving claims of several persons arising out of similar discriminatory treatment, not all of them need to have filed EEOC charges as long as one or more of the plaintiffs had satisfied the requirement.'[7] In *Oatis v. Crown Zellerbach Corp.*, we held that it is not necessary for each member of a class to file an EEOC charge as a prerequisite to join a Title VII suit as long as at least one named plaintiff had filed such charges.[8] *Wheeler v. American Home Products Corp.* extended *Oatis* to non-class suits, holding that similarly situated intervenors who had not filed EEOC charges could maintain a Title VII claim if the original plaintiffs had filed timely charges.[9] In both *Oatis* and *Wheeler*, this Court held that certain eligible parties were excused from filing an EEOC charge when they were permitted to join or intervene in a lawsuit in which the original, similarly situated plaintiff had fully exhausted the administrative requirements.
>
> This Circuit further explained the piggyback concept in *Bettcher v. The Brown Schools, Inc.*, in which [the Fifth Circuit] stated that the 'single filing rule' is a 'carefully limited exception' that allows parties to 'opt-in to a suit filed by any similarly situated plaintiff under certain conditions.'[10] In *Bettcher*, this Circuit would not allow a plaintiff to piggyback on the EEOC charge filed by a fellow

---

[6] This rule/exception is referred to, interchangeably, as "single file", "single filing", "piggyback", or "piggybacking" rule.
[7] *Crawford v. United States Steel Corp., et al.*, 660 F.2d 663, 665 (5th Cir. 1981).
[8] *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir. 1968).
[9] *Wheeler v. American Home Products, Corp.*, 582 F.2d 891, 897 (5th Cir. 1977).
[10] *Bettcher v. The Brown Schools, Inc.*, 262 F.3d 492, 493-94 (5th Cir. 2001) (citing *Anson v. Univ. Texas Health Science Ctr.*, 962 F.2d 539, 540 (5th Cir. 1992).

employee who had received a right-to-sue notice from the EEOC but decided not to file suit. The Court explained that there are three conditions that must be satisfied before a plaintiff may invoke the single filing rule:

> First, the plaintiff must be similarly situated to the person who actually filed the EEOC charge. Second, the charge must have provided some notice of the collective or class-wide nature of the charge. Finally, a prerequisite – implicit to be sure – for piggybacking under the single filing rule is the requirement that the individual who filed the EEOC charge must actually file a suit that the piggybacking plaintiff may join.[11]

*Price v. Choctaw Glove & Safety Co., Inc.*, 459 F.3d 595, 598-99 (5th Cir. 2006).

Moreover, in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Supreme Court held that "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554. "Tolling, however, does not continue indefinitely. If the district court denies certification, or if it certifies the class but later decertifies it, tolling ceases." *Odle v. Wal-Mart Stores, Inc.*, 747 F.3d 315, 320 (5th Cir. 2014). "At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983).

The single filing rule under Fifth Circuit caselaw operates to bar "piggybacking" on others' claims and allegations after filing an independent suit. In *Nelson v. Shoney's Inc.*, Civ. A. No. 96-2199, 1997 WL 567957, at *5 (E.D. La. Sept. 10, 1997), the court held that Ms. Nelson could not raise a federal claim for race discrimination or retaliation because she failed to raise these claims in her EEOC charge. *Id.* The court stated, "Because Ms. Nelson had filed her own EEOC charge, she cannot take advantage of the 'single filing rule'". *Id. See also Wesley v. Yellow Transp., Inc.*,

---

[11] *Id.* at 494 (internal citations omitted).

3:05-CV-2266-D, 2008 WL 294526, at *5 (N.D. Tex. 2008) (finding the single filing rule "does not apply where the respective plaintiffs filed separate EEOC charges and separate lawsuits"). Indeed, the Fifth Circuit has stated:

> Once the charge is filed, unless it is permissibly modified, the EEOC and the employer are entitled to rely on the allegations contained therein.  To allow a plaintiff to file an EEOC charge, file suit upon that charge and then, at the eleventh hour, when the statute of limitations has run, to amend his complaint in reliance on the charge of another belies the policies behind the single filing rule and controverts congressional intent.  The employee, by failing to assert a particular allegation in his charge, has necessarily excluded himself from the class of persons purportedly covered by the charge of another.  As a result, the EEOC and the employer are given no notice and no opportunity to remedy his complaint.  He is bound by the parameters of his own EEOC charge and cannot subsequently utilize the single filing rule to avoid the statute of limitations.

*Mooney v. Aramco Services Co*., 54 F.3d 1207, 1223 (5th Cir. 1995), *reversed on other grounds*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  Because the single filing rule does not allow a plaintiff to amend his complaint to allege the claims of other plaintiffs in unrelated lawsuits, the plaintiff is subject to the general rule, which requires exhaustion of administrative remedies.  *See Price*, 459 F.3d at 598 (stating that the piggyback concept is a "carefully limited exception" that allows parties to opt-in to a suit filed by any similarly situated plaintiff under certain conditions). This is also consistent with *Bettcher*, 262 F.3d at 495.  There, the court refused to expand the single filing rule to allow a non-charging plaintiff to file a suit based upon the charge of a party that had not filed suit.  *Id*.  According to the court, such "a reading would allow the single filing exception to consume the statutory rule."  *Id.*

### 5.    Hostile Work Environment

"A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Stewart v. Mississippi*

*Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (quoting *Morgan*, 536 U.S. at 116, 122 S.Ct. 2061), *distinguished on other grounds by, Heath*, 850 F.3d 731.

To affect a term, condition, or privilege of employment, the race-based harassment must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). To determine whether a work environment is "hostile," a court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ramsey*, 286 F.3d at 268 (quoting *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir.2000)).

Furthermore, "[a]n egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." *Lauderdale v. Texas Dept. of Crim. J., Institutional Div.*, 512 F.3d 157, 163 (5th Cir.2007) (citing *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 434–35 (5th Cir.2005)). "The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists." *Id.*

As this Court has recognized in a Title VII racial discrimination suit:

The mere utterance of an ethnic or racial epithet that engenders offensive feelings in an employee, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Rather, the plaintiff must establish that the harassment complained of was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment.

*James v. Lane,* No. 12–523, 2014 WL 4809272, slip op. at *7 (M.D.La.2014) (citations omitted). The Fifth Circuit is replete with instances in which a few isolated comments were insufficient to

establish Title VII liability. *E.G., Long v. Eastfield College,* 88 F.3d 300, 309 (5th Cir.1996) (single offensive joke about condoms in plaintiff's presence was insufficient to prove hostile work environment claim); *Mosley v. Marion County, Miss.,* 111 Fed. Appx. 726, 728 (5th Cir.2004) (evidence of three instances of using racial slurs was insufficient to establish a genuine issue of material fact for a hostile work environment claim).

### 6.    Racial Discrimination - Disparate Treatment/Disparate Impact

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff can prove discrimination through direct or circumstantial evidence. *Turner v. Baylor Richardson Medical Center,* 476 F.3d 337, 345 (5th Cir. 2007) (citing *Laxton v. Gap, Inc.,* 333 F.3d 572, 578 (5th Cir. 2003)). If there is no direct evidence of discrimination, then Title VII claims based on circumstantial evidence are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817 (1973). *Id.*

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of racial discrimination. If a plaintiff does so, an inference of intentional discrimination is raised. *Lee v. Kansas City Southern Ry. Co.,* 574 F.3d 253, 259 (5th Cir.2009)(citing *LaPierre v. Benson Nissan,* 86 F.3d 444, 448 (5th Cir.1996)). "[T]he employer must [then] rebut [the] presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action." *Turner,* 476 F.3d at 345. "If the employer can provide a legitimate nondiscriminatory explanation, the inference of discrimination drops out and the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext for racial

26

bias." *Lee,* 574 F.3d at 259. "If the plaintiff can show that the proffered explanation is merely pretextual, that showing, when coupled with the prima facie case, will usually be sufficient to survive summary judgment." *Turner,* 476 F.3d at 345 (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255–56, 101 S.Ct. 1089, 1094–1095 (1981)).

"Although the precise elements of [a *prima facie*] showing will vary depending on the circumstances, the plaintiff's burden at this stage of the case 'is not onerous.'" *Reed v. Neopost USA, Inc.,* 701 F.3d 434, 439 (5th Cir.2012) (citations omitted). The Fifth Circuit has explained that, "[t]o establish a prima facie case of racial discrimination in employment, an employee must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Lee,* 574 F.3d at 259 (citations omitted); *McCormick v. Board of Supervisors of Louisiana State University*, 2004 WL 856657 at. *2 (E.D. La. April 19, 2004). *See also Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990).

Although the Fifth Circuit has held that a disparate treatment *prima facie* case can be made out solely with statistics if there is a sufficient disparity, generally more recent cases have required additional proof. *Wheeler v. City of Columbus, Mississippi*, 686 F.2d 1144 (5th Cir. 1982). However, a plaintiff may prove a *prima facie* case if gross statistical disparities are shown in the analysis of pertinent data. *EEOC v. American Airlines, Inc.*, 48 F.3d 164, 173 n.9 (5th Cir. 1995). Statistical evidence has been used in many disparate treatment cases, and in some instances the court has found flaws in the statistical paradigm.

A disparate-impact plaintiff must show (1) a facially neutral policy; (2) that, in fact, has a disproportionately adverse effect on a protected class. Furthermore, proof of discriminatory motive is not required for disparate-impact claims." *Pacheco v. Mineta,* 448 F.3d 783, 791 (5th Cir. 2006). In *Pacheco*, the Fifth Circuit concluded that, "On its face, [Plaintiff's] administrative charge allege[d] none of the elements of disparate impact. Instead, it is facially a disparate-treatment claim ... alleging that he was singled out for intentional discrimination because of his race." *Id.* at 791. The appellate court also noted that, "in particular," the charge "fail[ed] to identify any neutral employment policy that would form the basis of a disparate-impact claim" and that "[a] neutral employment policy is the cornerstone of any EEO disparate-impact investigation, since the EEO must evaluate both the policy's effects on protected classes and any business justifications for the policy." *Id.* at 792. The Fifth Circuit concluded:

> In this case, we hold that a disparate-impact investigation could not reasonably have been expected to grow out of [plaintiff's] administrative charge because of the following matters taken together: (1) it facially alleged disparate treatment; (2) it identified no neutral employment policy; and (3) it complained of past incidents of disparate treatment only.

*Id.*

### C.    Evidentiary Objections

#### 1.    Plaintiffs' Motion to Strike (Doc. 793)

Defendant filed a reply memorandum on January 27, 2020.  (Doc. 786).  Attached to Defendant's reply memorandum were several exhibits: (1) deposition transcript excerpts of Louis LeBlanc, (Doc. 786-1); (2) deposition transcript excerpts of Jeffrey Armstrong, (Doc. 786-2); (3) deposition transcript excerpts of Willie Stone, (Doc. 786-3); (4) a right to sue letter for James Miles, (Doc. 786-4); (5) a second right to sue letter for James Miles, (Doc. 786-5); (6) a Declaration of Neal Paul Miller, (Doc. 786-6); (7) deposition transcript excerpts of James Womack, (Doc. 786-

7); and (8) deposition transcript excerpts of Larry Bell, (Doc. 786-8).

Plaintiffs moved to strike the exhibits attached to Defendant's reply on January 30, 2020. (Doc. 793). Plaintiffs argued that Defendant offered "new" evidence that "started the process all over again". (Doc. 793-2, p. 2). Defendant opposed the motion to strike on February 11, 2020. (Doc. 801). Defendant argued that Plaintiffs' motion should be denied because: Plaintiffs cited no legal authority for their position; Plaintiffs raised new factual issues in their opposition to Defendant's motion for summary judgment that contradicted prior deposition testimony, to which Defendant needed to respond; Plaintiffs did not object to LeBlanc's declaration in the past; and Plaintiffs are not prejudiced. (*Id.*, p. 1). Importantly, Defendant highlights that all of the exhibits to which Plaintiffs object, with the exception of the declaration, are in the possession of Plaintiffs. (*Id.*, p. 2). With regard to the declaration, Defendant argues that it was offered solely to cure foundational objections and that it has been "long utilized" in prior briefing and a part of the record objection-free for decades. (*Id.*, p. 3, n. 2).

The Court ordered that the parties would be allowed to engage in additional, limited briefing to address the "new" exhibits. (Doc. 808). The Court further ordered that the substantive objections would be ruled upon in concert with ruling upon Defendant's motions for summary judgment. (*Id.*). Plaintiffs then addressed the "new" exhibits. (Doc. 814).

Having considered the parties' briefs and the exhibits at issue, the Court <u>denies Plaintiffs' motion to strike with prejudice</u>. All exhibits, including the declaration, have been and are in the possession of Plaintiffs and do not constitute "new" evidence. Further, Plaintiffs are not prejudiced by the admission of the exhibits.[12]

---

[12] Plaintiffs filed a second motion to strike on April 6, 2020. (Doc. 834). This motion has already been ruled upon and denied. (Doc. 838).

## 2.   Defendant's Evidentiary Objections

Defendant objects to the declarations offered by Plaintiffs in support of their opposition. (Doc. 786; Doc. 800; Doc. 810; Doc. 833).   Defendant argues that the declarations offered by Plaintiffs are "inadmissible because they are improper as to form in that they lack signatures and dates; because most of the statements in those declarations lack foundation and consist largely of vague, conclusory, and hearsay arguments; and because some contradict prior declarations and deposition testimony."  (Doc. 786, pp. 2-3).

Generally, the party opposing summary judgment is obliged to set forth specific facts which demonstrate a genuine issue for trial. FRCP 56; Local Rule 56.2.  When the nonmovant "fails to direct the Court to specific evidence in the record to controvert the supporting evidence set forth by the [movant] … the fact is deemed admitted pursuant to Local Rule 56.2."  *Antoon v. Woman's Hospital Foundation d/b/a Woman's Hospital*, 2012 WL 1094715, *2 (M.D. La. May 30, 2012).

Conclusory statements without proper support do not meet the requirements of Rule 56(e). *See Goodman v. Life Ins. Co. of North America*, 244 F.3d 138 (5th Cir. Dec. 15, 2000)(citing *Boyd v. State Farm Ins. Cos*., 158 F.3d 326, 331 (5th Cir. 1998); *Duffy v. Leading Edge Products, Inc*., 44 F.3d 308, 312 (5th Cir. 1995)("Although we consider the evidence in the light most favorable to the nonmoving party, … conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment.")(internal citations omitted); and *Galindo v. Precision American Corp*., 754 F.2d 1212, 1216 (5th Cir. 1985)); *See also Miller Exploration Co. v. Energy Drilling Co*., 130 F.Supp.2d 781, 785 (W.D. La. Jan. 3, 2001).

"Rule 56(e) requires declarations offered in support of summary judgment to be based on personal knowledge."  *Bright v. Ashcroft*, 259 F.Supp.2d 494, 498 (E.D. La. Feb. 11, 2003)(citing

Fed.R.Civ.P. 56(e); *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 530 (5th Cir. 1992)). Rule 602 of the Federal Rules of Evidence further requires a submitting party to lay proper foundation that witnesses have personal knowledge of the matter about which they will testify. "[A] court may strike any affidavit that is not based on personal knowledge." *Bright,* 259 F.Supp.2d 494, 498 (5th Cir. 2003)(citing *Akin*, 959 F.2d at 530; *CMS Indus., Inc. v. L.P.S. Int'l, Ltd.*, 643 F.2d 289, 295 (5th Cir. 1981)). To demonstrate personal knowledge, an affidavit "must include enough factual support to show that the affiant possesses that knowledge." *Thomas v. Atmos Energy Corp.*, 223 F. App'x 369, 374 (5th Cir. 2007).

With regard to the attestations contradicting deposition testimony, the Court has found guidance in two district court cases, which rely on Fifth Circuit case law. In *Sandras v. Freeport-McMoran,* 889 F.Supp. 901 (E.D.La.1995), the court was faced with "a genuine contradiction of fact" and reasoned that "the fact that the conflict arises between plaintiff's deposition and his own affidavit is of no moment, for the Fifth Circuit has instructed that a court must consider all evidence before it on a motion for summary judgment, 'including affidavits that conflict with deposition testimony.'" *Id.* at 903 (citing *Dibidale v. American Bank & Trust Co.,* 916 F.2d 300, 307 (5th Cir.1990)). The court went on to state that "a genuine issue of material fact may be raised by such an affidavit even if it conflicts with earlier testimony in the party's deposition." *Id.* (internal quotations and citations omitted). Likewise, in *Ramos v. Geddes,* 137 F.R.D. 11 (S.D.Tex.1991), the court noted:

> Not every discrepancy between an affidavit and prior deposition testimony indicates a sham and use of an affidavit to clarify a deponent's confusion during a deposition is appropriate. To the extent there is confusion or contradiction between ... deposition testimony and [an] affidavit, they present credibility issues that are properly put to the trier of fact. A genuine issue of fact can be raised by an affidavit even if it conflicts with earlier deposition testimony by the same person.

*Id.* at 12 (internal citations omitted).  *See also, Legier and Materne v. Great Plains Software, Inc*., 2005 WL 1400398, *2 (E.D. La. June 2, 2005)("The reason for the change given by Ms. Lind was that she could not remember exactly which product lines were included in the search without reading the … query.  Ms. Lind's original testimony … does not contradict the reason provided."); *Innovative Marketing & Technology v. Norm Thompson Outfitters, Inc*., 171 F.R.D. 203, 204 (W.D. Tex. 1997)(where the court denied the defendant's motion to strike the errata sheets where reasons for changes were to clarify, to correct a misstatement, or to correct a response because the deponent did not understand the question.).

Here, Plaintiffs attest that they have personal knowledge of the information contained in their declarations.  The declarations show enough factual support that the declarant possesses that knowledge.  The Court's impression is that Plaintiffs are offering the declarations of the Plaintiffs set forth below as purported testimonial, evidentiary support for the specific facts set forth in the complaint, in support of all Plaintiffs' claims, and in direct response to the affidavit of Louis LeBlanc.  One is able to glean from the declarations that the declarant's knowledge is based on their work, experience and/or membership with Local 198.  Also, the declarations largely attest to the purported inaccuracies and untruthfulness of specific paragraphs in Louis LeBlanc's affidavit.

### a. *Declaration of Larry Bell*

Larry Bell's declaration is signed, but it is not notarized or dated.  An unsworn declaration is not competent summary judgment evidence *unless* it contains statements that it was made "under penalty of perjury" and is verified as "true and correct."  *See Ion v. Chevron USA, Inc.,* 731 F.3d 379, 382 n. 2 (5th Cir. 2013) (quoting 28 U.S.C. § 1746(2)); *Nissho–Iwai Am. Corp. v. Kline,* 845 F.2d 1300, 1306 (5th Cir. 1988) (same).  Bell's declaration specifically states immediately above his signature that he makes his declaration "under penalty of perjury".  (Doc. 770-13, p. 7).  Also,

although the declaration is not dated, it was clearly drafted and signed after MSJ 1 was filed as the attestations directly address the attestations of Louis LeBlanc. Thus, the timing of the testimony can easily be gleaned from the declaration itself.

Defendant seeks to strike Plaintiffs' declarations on the grounds that the declarations "contain conclusory facts and conclusions of law that cannot be utilized on a summary judgment motions" and because they are not based on personal knowledge. (Doc. 786, p. 3). Defendant also argues that the declarations contradict earlier declarations and/or deposition testimony and should be stricken. (*Id.*, pp. 4-7). Specifically, Defendant challenges Larry Bell's attestation regarding Louis LeBlanc's association with the KKK and bringing David Duke to speak at the union hall. (*Id.*, p. 4). However, in his deposition, Defendant claims that Larry Bell testified that "guys told me about guys", meaning that no one told him directly that they were a member of the KKK. (*Id.*, p 5).

The Court has reviewed the Declaration of Larry Bell in light of the objections stated above. Based on the legal authority stated above, the Court finds that the declaration contains a sufficient foundation and is based on Larry Bell's purported personal knowledge. The Court will not strike the declaration on the basis that it contradicts prior deposition testimony for the reasons stated above. *See Sandras, supra, Ramos, supra*, and *Legier, supra*. For the foregoing reasons, Defendant's objection to the Declaration of Larry Bell is overruled.

b.    *Declaration of Wayne Dukes*

Wayne Dukes' declaration is signed, notarized and dated. It is in proper form. Defendant argues that it should be stricken because is unclear who "they" are in the declaration. (Doc. 800, p. 4). Also, Dukes attests to two men dating black women which is irrelevant and "bizarre". (*Id.*). Defendant argues that Dukes' testimony should be stricken because it is not based on personal

knowledge, is speculative and constitutes hearsay.  (*Id.*, p. 5).  For the reasons stated above, the Court will consider Dukes' declaration, with the exception of the testimony regarding other men dating black women which is wholly unrelated to this litigation and irrelevant.

c.    Declaration of Lee Fox

Lee Fox's declaration is signed and notarized but not dated.  It was filed in January 2020, and from a reading of the declaration, it is simple to discern that it was executed around this time period.  For the reasons stated above with regard to Bell's declaration, Fox's declaration will not be stricken for form.

Defendant argues that portions of Lee Fox's declaration are not based upon personal knowledge and are pure speculation and should be stricken.  (Doc. 786, pp. 3-4). The Court has reviewed the declaration, and based on the legal standards set forth above, finds it sufficiently based in fact for purposes of summary judgment evidence.  For the same reasons as set forth above regarding the Declaration of Larry Bell, Defendant's objection to the Declaration of Lee Fox is overruled.

d.    Declaration of Larry Gilmore

Larry Gilmore's declaration is signed, notarized and dated.  (Doc. 784-2).  It is proper as to form.

Defendant objects to the declaration as being "generalized, undated, conclusory, hearsay, and without foundation and containing boilerplate language".  (Doc. 800, p. 1). Based on the legal authority set forth above and for the same reasons stated above with regard to the Declaration of Larry Bell, the objections to the Declaration of Larry Gilmore are overruled.  A sufficient foundation and context are provided for the attestations.  The Court notes the "form" language that re-appears in the declarations offered by Plaintiffs and will consider same in ruling upon each

Plaintiff's claims as a whole.

e.    *Declaration of Rayfield Goings*

Rayfield Goings' declaration is signed, notarized and dated.  It is proper as to form.  For the same reasons as those stated for Larry Gilmore's declaration, Defendant's objections to Goings' declaration are overruled.

f.    *Declaration of Carl Judson*

Carl Judson's declaration is signed, notarized and dated.  It is proper as to form.  Defendant objects to Carl Judson's declaration on the same grounds as those for challenging Larry Gilmore's declaration.  (Doc. 810-2).  For the same reasons as those stated for Larry Gilmore's declaration, Defendant's objections to Judson's declaration are overruled.

g.    *Declaration of Kenneth Judson*

Kenneth Judson's declaration is signed, but it is not notarized or dated.  For the same reasons as those stated above regarding Larry Bell's declaration, Judson's declaration is proper as to form.

Defendant objects to Kenneth Judson's declaration by stating that "there is no statement in Mr. Kenneth Judson's declaration that is worthy of being credited, and the entire document should be stricken."  (Doc. 800, p. 4).  The Court will not strike Judson's declaration on these general grounds; however, the Court will consider Defendant's more detailed argument at Doc. 800 in ruling upon Judson's claims as a whole.  For the same reasons as those stated for Larry Bell's declaration, Defendant's objections to Judson's declaration are overruled.

h.    *Declaration of Roberta McDomic*

Roberta McDomic submitted an affidavit that is signed, notarized and dated, (Doc. 737-26); a declaration that is signed and dated "under penalty of perjury", (Doc. 737-27); and a

declaration that is signed and dated "under penalty of perjury", (Doc. 781-1, p. 2). All are proper as to form and will be considered. The declaration at Doc. 737-27 contains a "supplement" that is neither signed, nor dated, and it will not be considered. Defendant's objections to the form of McDomic's affidavit and declarations are sustained in part and overruled in part.

### i.    Declaration of James Miles

Defendant seeks to strike the Declaration of James Miles. (Doc. 833). Miles' declaration is signed, dated, and notarized. It is proper as to form. Defendant argues that Miles' declaration contradicts prior deposition testimony. (*Id*., pp. 5-6). The deposition testimony referenced is a series of questions regarding Miles' inability to recall his foreman's name. In his declaration, he was able to give more detail. For the reasons and legal authority stated above, Defendant's objections to Miles' declaration are overruled, and the declaration will be considered.

### j.    Declaration of Sam Parker

Plaintiffs offered the Declaration of Sam Parker, which contains signatures, two of seven pages are notarized, and two different dates. (Doc. 770-28). The declaration pages are out of order, and even when placed in numerical order, they do not make sense. It is clear to the untrained eye that the declaration is a form declaration that was copied and pasted together in a very rudimentary fashion. Although Sam Parker's signature, or what purports to be Parker's signature, is at the bottom of each page, the declaration is suspicious. However, there is no evidence before the Court that the signature is not Parker's signature and that the declaration is unreliable. The Court will admit the declaration and consider same in concert with ruling on Defendants' motions for summary judgment. The deficiencies of the declaration noted above will be considered when ruling upon Parker's claims.

> k.    *Declaration of Willie Stone*

Willie Stone's declaration is signed, notarized and dated.  It is proper as to form.  Defendant objects to Stone's declaration because it contradicts prior deposition testimony.  (Doc. 786, p. 5). For the same reasons as those stated for Larry Bell and Larry Gilmore, Defendant's objections to Stone's declaration are overruled.

> l.    *Declaration of Alfred Wallace*

Alfred Wallace's declaration is signed, but it is not notarized or dated.  For the same reasons as those stated above regarding Larry Bell's declaration, Wallace's declaration is proper as to form, and Defendant's objections to Wallace's declaration are overruled.

> m.    *Declaration of James White*

The Declaration of James White is signed "under penalty of perjury" and dated.  It is proper as to form.

> n.    *Declarations of Plaintiffs Addressed in Doc. 833*

Defendant challenges the Declarations of Charles Adams, Lee Fox, and James Miles on similar grounds as those discussed above.  (Doc. 833, pp. 1-6).  Based on the legal authority and analysis set forth above, Defendant's objections are overruled.

**D.    Analysis**

**1.    Discovery and Amendments to the Complaint**

The Wilson Plaintiffs argue a need for additional discovery prior to any claims being dismissed.  (Doc. 781; Doc. 842, pp. 3-6).  Defendant opposes the Wilson Plaintiffs' request for additional discovery, highlighting that Plaintiffs made this same argument in response to Defendant's first motion for summary judgment filed in 1999.  (Doc. 789, p. 1).  In further response, Defendant highlights this Court's prior order that the Wilson Plaintiffs should "address

what additional discovery is needed in order to more properly oppose the motion, why that discovery is needed, why Plaintiffs do not already have the necessary information, and how much time Plaintiffs require in order to obtain the information." (Doc. 757, p. 2). Presumably in response to Defendant, the Wilson Plaintiffs filed a second opposition and explained that the "most likely way to prove this discrimination would be through some type of paper trail yet to be discovered (as far as this attorney knows)." (Doc. 842, p. 4). The Wilson Plaintiffs claim that discovery produced to counsel for the other Plaintiffs, clients of Ms. Grodner, were "inaccessible to this attorney" due to Ms. Grodner's "unique filing system". (*Id.*, n. 5). The Wilson Plaintiffs admit that they do not know "how to locate such discovery" and "cannot determine if these documents or depositions have been produced". (*Id.*, p. 5). Plaintiffs simply state generally that depositions and documents are needed on the issues of referrals and recall jobs; however, the Wilson Plaintiffs[13] do not explain why they do not already have this information and/or how much time is necessary to obtain this information.

Under Federal Rule of Civil Procedure 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may" take certain actions, including "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." District courts have discretion to grant or deny a Rule 56(d) motion. *See Am. Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (citing *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010).

---

[13] The Plaintiffs represented by Ms. Grodner are not requesting additional discovery, only those represented by Mr. Wilson. While the Wilson Plaintiffs generally argue that depositions and documents are needed in order to respond to Defendant's motion, they simultaneously admit that they do not know what has already been requested and received and express confusion over Ms. Grodner's file management procedures. This suggests that the discovery exists and is available to the Wilson Plaintiffs, but they are overwhelmed and befuddled with how to go about sifting through the discovery. Given the decades that this matter has been pending and the filings in this matter, Plaintiffs' argument is not surprising; however, the Court fails to find good faith grounds to support further delay and duplicative discovery.

"Rule 56(d) motions for additional discovery are 'broadly favored and should be liberally granted' because the rule is designed to 'safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'" *Am. Family*, 714 F.3d at 894 (quoting *Raby*, 600 F.3d at 561) (quoting *Culwell v. City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006))).

"Nevertheless, nonmoving parties requesting Rule 56(d) relief 'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts.'" *Am. Family*, 714 F.3d at 894 (quoting *Raby*, 600 F.3d at 561). "Instead, the non-moving party must 'set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion.'" *Am. Family*, 714 F.3d at 894 (quoting *Raby*, 600 F.3d at 561).

The Wilson Plaintiffs fail to meet this liberal standard. As the Court explained at the status conference held on December 17, 2019, Mr. Wilson was instructed to, "specifically address [in his opposition] what additional discovery is needed in order to more properly oppose the motion, why that discovery is needed, why Plaintiffs do not already have the necessary information, and how much time Plaintiffs require in order to obtain the information." (Doc. 757, p. 2). The Wilson Plaintiffs did not "specifically" address what additional discovery is needed. Plaintiffs generally address "depositions and documents" but then admit that they do not know what discovery has already been conducted. In other words, not only do Plaintiffs not identify who they wish to depose, but they admit that person may have already been deposed. Likewise, Plaintiffs generally state that this general discovery is needed for the referral and recall procedures, but, again, Plaintiffs cannot say whether that discovery has already taken place or why Plaintiffs have waited

until now to even suggest this discovery.  Plaintiffs wholly fail to state how much time is needed to obtain this general information.

As such, Plaintiffs failed to satisfy the Rule 56(d) standard and fully comply with the Court's order.  Considering that this matter has been pending for over 20 years and that Defendant's motion for summary judgment was discussed for almost a year before it was filed, eliciting no attempts at discovery by Plaintiffs, Plaintiffs' request for additional discovery must be denied.

As to the Wilson Plaintiffs' contention that Defendant's motions should be treated as motions to dismiss pursuant to Rule 12(b)(6) and, therefore, allow the Wilson Plaintiffs sufficient time to amend their pleadings and/or conduct additional discovery, (Doc. 781), the Court declines to do so.  This matter has been pending for over 20 years.  There have been more than five amendments or attempted amendments to the complaint.  Multiple extensions for discovery have been granted.  The subject motions for summary judgment have been discussed for almost one year prior to their filings.  Not only is this matter long past the Rule 12/motion to dismiss stage, but both parties have submitted exhibits in purported support of their respective arguments and ask the Court to consider same as evidence outside of the pleadings.  Thus, even if Defendant had filed a motion pursuant to Rule 12, as opposed to Rule 56, it likely would have been converted to a motion for summary judgment.  Considering that there are no good grounds upon which this Court should convert Defendant's motions to a motion to dismiss, Plaintiffs' request is denied.

### 2.     This is not a class action proceeding.

It should be clear that this matter is not a class action proceeding.  The original Plaintiffs filed suit on May 1, 1998.  (Doc. 1).  Plaintiffs sought to have this matter certified as a class action proceeding.  This Court denied class certification on October 29, 1999.  (Doc. 196).  Plaintiffs

appealed this ruling, and the Fifth Circuit Court of Appeals affirmed this Court's ruling and remanded this matter for further proceedings. (Doc. 212). Currently, there are 39 Plaintiffs remaining in this matter. Each of the 39 Plaintiffs is a separate individual, bringing his/her own claims as if he/she filed suit independently. Each Plaintiff must meet his/her burden of proof on his/her claims. *See Celestine*, 266 F.3d 343 ("After denial of class certification was affirmed," the employee plaintiffs "proceeded forward with a series of individual claims."); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 416-17 (5th Cir. 1998) ("each class member would have to show that the discrimination caused a loss").

In opposition to MSJ 2, Plaintiffs state, "Local 198 complains that the Claimant's petitions lack a statement as to what it did to each individual plaintiff to provide a specific prima[] facie case of discrimination as though each should tell a different story and as though the African American members were each treated differently by the Local 198, when the very same pervasive acts of discrimination were taken consistently against all of the [b]lack members." (Doc. 825-2, p. 2). Indeed, Defendant is correct. Each Plaintiff must prove his/her case. If each Plaintiff has a "different story", then it is incumbent upon Plaintiffs to not only "tell" that story, but to also support all necessary facts with proper summary judgment evidence. Proving one Plaintiff's case, does not equate to proving the case of every other Plaintiff. *See Crawford v. Western Elec. Co. Inc.*, 614 F.2d 1300, 1305-08 (5th Cir. 1980). *See also In re FEMA Trailer Formaldehyde Products Liability Litigation*, 2008 WL 5423488 (E.D. La. Dec. 29, 2008)(where class certification was denied and the claims of each individual member of the purported class required independent analysis).

The confusion amongst the parties is further evidenced by the following argument:

The Local 198 complains that the Claimants did not individualize their complaints after class certification. The complaints of class wide race discrimination are

common to the claimants.  The method, pattern and practice used by the Local 198 against one African American member was the same used against the next and the next and the next to deprive the African Americans of work and to create a hostile work environment.  That the Local 198 treated all of the African Americans the same is proof that there was not a single grudge against a single person, who happened to be [b]lack, but instead, pervasive race discrimination against a class of persons – African Americans.  The fact that the African Americans are not complaining that the Local 198 did one thing to one [b]lack member and something different to another and instead, the black members instead complain that Local 198 treated the entire group at a disadvantage to the white members, is proof of class wide discrimination.  That is discrimination against a class of persons.

(Doc. 825-2, pp. 2-3).  While it is undisputed that Plaintiffs are African American and, thus, members of a protected class, each Plaintiff must still demonstrate through competent summary judgment evidence that he/she is able to meet his/her burden of proof and that there is a genuine dispute suitable for trial.

### 3.    Pattern or Practice Claims

Because this matter is not a class action proceeding, the pattern or practice burden does not apply.  Also, "pattern or practice" is not a cause of action.  *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003); *see also Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 407–08 (5th Cir. 2016) (same), *cert. denied*, 137 S. Ct. 820 (2017); *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1219 (5th Cir. 1995).  To the extent Plaintiffs have plead a claim of "pattern or practice", this "claim" is dismissed.

### 4.    Did the Plaintiffs plead claims under Title VII?[14]

Defendant argues that none of the Title VII claims are "actionable" because: (1) no Plaintiff filed a complaint alleging Title VII claims within 90 days of receipt of a right to sue letter; *and* (2)

---

[14] This same question was addressed in the Court's ruling on Defendant's Motion to Amend Ruling and Plaintiffs' Omnibus Motion for Reconsideration.  (Doc. 726).  However, because Plaintiffs were raising its arguments for the first time in a motion for reconsideration, as opposed to asserting the argument in opposition to the underlying motion, the Court declined to address the merits of the issue at that time.

no Plaintiff has properly alleged a valid Title VII claim.  (Doc. 737-2, p. 25).  Defendant raises

two issues - timeliness of filing and sufficient pleading.  This section addresses whether Plaintiffs'

pleading of their Title VII claims is sufficient to render the claims before the Court.  Timeliness is

discussed in the next section.

Defendant contends that Plaintiffs do not present "valid" Title VII claims.  (*Id.*, p. 23).

Plaintiffs filed their initial complaint on May 1, 1998.  (Doc. 1).  The initial complaint pleads that

Plaintiffs filed a charge with the EEOC and that Plaintiffs "intend to amend" the complaint to seek

damages under Title VII once the EEOC issued right to sue letters.  (*Id.*, ¶ 86).  Plaintiffs sought

leave of court to amend the complaint on March 21, 2001, attempting to assert claims under Title

VII because the right to sue letters were issued; however, this amendment was withdrawn.  (Docs.

208 and 224).  On July 27, 2001, Plaintiffs sought leave of court to amend their complaint a second

time; however, the record does not reflect that leave of court was granted.  (Doc. 227).  Defendant

argues that Plaintiffs withdrew the "second" amended complaint within the "fifth" amended

complaint.  (Doc. 737-2, p. 24).  A "fourth" and "fifth" amended complaint were filed on

December 3, 2001.  (Docs. 274 and 283).  There is no "third" amended complaint.  In the "fifth"

amended complaint, Plaintiffs repeat the same language as is contained in the initial complaint

regarding an *intention* to later amend and assert claims under Title VII.  (Doc. 283, ¶ 85).

In response to Defendant's challenge to the "validity" of Plaintiffs' Title VII claims,

Plaintiffs argue that their filing on December 3, 2001, which was the "fifth" amending complaint,

was timely.  (Doc. 775, p. 2).  First, Plaintiffs point to their first attempt to amend the complaint

on March 21, 2001.  Plaintiffs claim that right-to-sue letters, dated March 3, 2001, were received

less than 90 days before the March 21, 2001 filing.  (*Id.*).  Plaintiffs highlight that Defendant

acknowledged notice of Plaintiffs' *intention* to timely assert their Title VII claims based on these

right-to-sue letters when Defendant opposed Plaintiffs' motion to amend the complaint.  (*Id.*, pp. 2-3).  Relying upon *Singleton v. Westminster Mgmt. Corp*., 1988 WL 15560, *1-2 (E.D. La. Feb. 24, 1988), Plaintiffs argue that its motion for leave of court seeking to amend the complaint and its "attached right to sue letters" relate back to the filing of the original complaint, which clearly put Defendant on notice of Plaintiffs' Title VII claims.  (*Id.*, pp. 3-4).  Plaintiffs admit that the motion for leave to amend the complaint was "withdrawn and dismissed as moot".  (*Id.*, p. 4, citing Doc. 224).  However, Plaintiffs quote the Court's Order that "Plaintiff[s] shall name all plaintiffs by this date [July 27, 2001] and shall indicate those plaintiffs either who have received their right to sue letters or have claims then pending before the EEOC.  The deadline for previously named plaintiffs to perfect those claims which were pending before the EEOC by filing an amended and supplemental complaint is August 27, 2001."  (*Id.*, p. 5, citing Doc. 224).  Defendant ignored or failed to address this Court Order in its challenge, and Defendant did not address the concept of "relation back".

Following the Court's Order, Plaintiffs filed an amended complaint on July 27, 2001. (Doc. 227).  In the amended complaint, Plaintiffs "allege claims" under Title VII for damages "once the EEOC issues a 'right to sue' letter to all the Plaintiffs alternatively to all [P]laintiffs who will receive a right to sue letter in the future."  (*Id.*, ¶ 86).  Plaintiffs argue that some Plaintiffs asserted in the complaint that they received a right to sue letter.  For example, Plaintiffs plead that Charles Adams "has a perfected Title VII claim via a right to sue letter".  (*Id.*, ¶ 3).  Others, such as Kenneth Judson, plead an "un perfected Title VII claim".  (*Id.*, ¶ 3).  Plaintiffs argue that they "pled exhaustion, [r]elation back" and that this "satisfied" the Order and requirements of Rule 15. (Doc. 775, p. 5).

Plaintiffs acknowledge that Defendant sought to strike the amended complaint on August 13, 2001, (Doc. 228), but this motion was denied on December 3, 2001. (Doc. 227). Because the motion to strike was denied, Plaintiffs claim that Defendant should have answered the amended complaint by August 6, 2001, which it did not do, thereby waiving any affirmative defenses to the amended complaint. (Doc. 775, pp. 5-6). Plaintiffs seem to "split hairs" in contesting that they withdrew the amended complaint in their "fifth" amended complaint by arguing that the withdrawal was not contained in the motion for leave of court to file the "fifth" amended complaint or in the corresponding order; therefore, the withdrawal was never ordered. However, Plaintiffs acknowledge that the reference to the withdrawal is contained in the prayer of the actual "fifth" amended complaint; therefore, the Court never entered a formal order allowing for the withdrawal. (*Id.*, p. 6).

Plaintiffs' "fifth" amended complaint pleads that Plaintiffs filed a charge with the EEOC and "intend to amend" the complaint to allege violations under Title VII "in that the EEOC has issued a 'right to sue' letter to certain Plaintiffs as stated herein". (Doc. 283, ¶ 85). Plaintiffs also aver that under the "'One File Rule', all Plaintiffs now have a right to pursue their Title VII claims of disparate impact, disparate treatment, and hostile work environment as a result of the patterns and practices of the Defendant." (*Id.*, ¶ 90).

Plaintiffs contend that their July 27, 2001, filing and December 3, 2001, filings relate back to the filing of the original complaint, (Doc. 775, p. 7), and that Defendant should not be allowed to rely upon a "technicality" with regard to the dates of the right to sue letters and the pleading of the Title VII claims. Plaintiffs claim that the Court's Order to amend by these dates, as well as the "piggy-back" rule and "relation back" rule, render Plaintiffs' Title VII claims timely as Defendant

was on notice.  (*Id.*, pp. 7-8).  Plaintiffs acknowledge that the exhaustion of the Title VII claims "was not specifically pled through an amendment".  (*Id.*, p. 8).[15]

The Court has reviewed the record, complaints, and previous Court orders related to withdrawal of pleadings, striking of pleadings, and amendment of pleadings.  Plaintiffs' multiple attempts to amend their original complaint are sloppy, confusing and inartful.  It is certainly unclear from a review of the multiple versions of the complaint, those attempted and those successful, which Plaintiffs have actual right to sue letters and the dates of same, which Plaintiffs do not have right to sue letters, and the specific allegations under Title VII of each Plaintiff.  Regardless, the Court cannot deny that Plaintiffs clearly expressed a desire to assert claims under Title VII in the original complaint.  The Court also cannot deny that Plaintiffs attempted to state the nature of each Plaintiff's claim and whether a right to sue letter was issued in Paragraph 3 of the first amended complaint filed in July 2001, which was timely filed in compliance with this Court's Order.  While Plaintiffs did not appropriately amend Paragraph 86 to clearly assert claims under Title VII and state that Plaintiffs were proceeding with these claims in light of the receipt of right to sue letters, Plaintiffs did attempt to address this issue in Paragraph 3.  The amended complaint reflects an intention of Plaintiffs to assert claims under Title VII and that some right to sue letters had been received.

The fact that this matter has been pending since 1998 and that the question of whether Plaintiffs asserted claims under Title VII has only now come to fruition is baffling to the Court, especially since motions on the merits of these claims have previously been entertained, and strongly suggests that even the parties understood that claims under Title VII had been properly

---

[15] In seeking reconsideration of the Court's ruling on the timeliness of Plaintiffs' claims, Plaintiffs acknowledged their errors in amending the complaint and admitted, "In fact, the Title VII claim was not perfected, until after the suit was filed, but not amended into the lawsuit. It is unknown why the claim was not amended."  (Doc. 711).

asserted. The Court is also mindful of the view of the Fifth Circuit Court of Appeals on matters of amended pleadings and "technicalities". In *Hunt v. International Business Machines, Inc*., 3 F.3d 436 (5th Cir. 1993), because the limitations period on certain of Hunt's claims was about to expire, Hunt filed suit before receiving a notice of right to sue on his pending EEOC charge. His original complaint advised that he would seek leave to assert a race discrimination claim under Title VII upon receipt of a right to sue letter. Hunt moved the district court for leave to amend within 90 days of receiving a right to sue letter, but the district court denied the request. Later, the district court granted summary judgment in favor of the defendant because Hunt's Title VII claims were never amended and were then untimely.

The Fifth Circuit stated that the district court's ruling in *Hunt* exceeded its discretion and the defendant had improperly "elevated form over substance". The Court concluded that "Congress did not intend the statutory prerequisites to advancing a Title VII claim to become a procedural minefield." Such logic equally applies here.

Plaintiffs initially filed suit on May 1, 1998, pleading an intention to assert claims under Title VII and amend the complaint once the right to sue letters were received from the EEOC. The record reflects that Plaintiffs attempted to amend the complaint upon receipt of right to sue letters in March 2001. After a status conference with the Court, it was ordered that Plaintiffs would withdraw the March 2001 amendment and file a second amendment by July 27, 2001, due to the anticipation of additional right to sue letters. Pursuant to this agreement and Court Order, Plaintiffs amended the complaint, as set forth above, on July 27, 2001. Plaintiffs again amended the complaint in December 2001. In both instances, Plaintiffs did not clearly amend the language of Paragraph 86 to state that right to sue letters were received and that Plaintiffs were asserting their claims under Title VII. However, Plaintiffs plead in Paragraph 3 which Plaintiffs received right

to sue letters and which claims were "perfected" or "un[-]perfected". Contrary to Defendant's argument, the July and December 2001 amendments stand and were not withdrawn or stricken.

Considering all of the above, the Court finds that Plaintiffs have amended their complaint and asserted claims under Title VII. Thus, the Court finds that Plaintiffs' claims under Title VII are before the Court.

### 5.     Timeliness of Plaintiffs' Title VII Claims

As to whether Plaintiffs' claims under Title VII are timely or not, this Court has previously ruled upon this issue. (Doc. 700). In fact, several years ago, the issue of timeliness of Plaintiffs' claims was singled-out as an issue that should be separately addressed before proceeding with any other motions on the merits of Plaintiffs' claims. This specific issue was discussed at multiple status conferences with the Court, additional discovery as to the issue of timeliness was addressed, and a briefing schedule was ordered. In response, Defendant chose which of the Plaintiffs' claims to challenge on the grounds of timeliness. Defendant's motion for summary judgment on the issue of timeliness was not directed to all Plaintiffs' claims,[16] presumably because Defendant deemed some of the Plaintiffs' claims timely. Plaintiffs opposed Defendant's motion regarding timeliness as to those Plaintiffs' claims that were challenged. For Defendant to raise this exact same issue again, now including Plaintiffs' claims that were not previously included, is problematic and defies the intent of the Court's Order to separately and preliminarily address the issue of timeliness before proceeding to the merits. With that in mind, the Court is hesitant to open the proverbial Pandora's box, yet again, and re-visit the issue of the timeliness of Plaintiffs' Title VII claims.

---

[16] For example, Defendant did not move for summary judgment against Charles Adams on the grounds of the untimeliness of his claims. (Doc. 700). However, in the motions presently before the Court, Defendant argues that Adams' Title VII claims are untimely. (Doc. 804-1, p. 12). Defendant bases its current challenge on the fact that Adams filed suit on May 1, 1998; filed his EEOC charge on March 30, 2000; received his right to sue letter dated November 3, 2000; and did not amend the complaint until July 27, 2001, which was greater than 90 days after receipt of the right to sue letter. Defendant does not address notice, relation back, continuing violations, etc.

Subject to the foregoing, a claimant must file a Title VII discrimination claim with the EEOC within 300 days of the challenged discrimination. *See* 42 U.S.C.2000e–5(e)(1)(2003); *Byers v. Dallas Morning News,* 209 F.3d 419, 424 (5th Cir. 2000). Only a few of the Plaintiffs filed discrimination charges with the EEOC.[17] The others can only pursue Title VII claims if they can "piggyback" onto a timely filed claim. *See Allen v. United States Steel Co.,* 665 F.2d 689, 695 (5th Cir. 1982). In this Court's prior ruling, it addressed, Plaintiff by Plaintiff, the dates of filed charges and calculated 300 days prior to that date to address the date for assessing the timeliness of claims. (Doc. 700). Any purported discriminatory conduct that occurred prior to that date would be time-barred, unless the continuing violations doctrine applied.

Now, Defendant does not argue that the continuing violations doctrine and "piggyback" rule do not apply to Plaintiffs' claims. Instead, Defendant argues technicalities of amended pleadings that were (or were not) "withdrawn" that included right to sue letters which Defendant argues are now "withdrawn" and not to be considered on summary judgment. Defendant identifies two dates applicable to right to sue letters (November 8, 2000, and March 9, 2001) and argues that suit was not filed timely. (Doc. 786, pp. 11-12). Specifically, Defendant states that the following Plaintiffs received their right to sue letters: Charles Adams, David Dixon, Lee Fox, Kevin Gauthier, James Miles, and Derrick Wicker. (*Id.*, pp. 11-12). In a conclusory manner, Defendant states that because these six Plaintiffs are the only Plaintiffs that filed charges, because the right to sue letters are dated no earlier than November 8, 2000, and because the initial complaint was filed

---

[17] It is unclear to the Court at this juncture exactly who filed charges with the EEOC and who received right to sue letters. Plaintiffs have admitted in the past that a few of the Plaintiffs believe that they filed charges with the EEOC, but no one has a copy of the charge and/or is able to produce a copy of the charge. Likewise, a few of the Plaintiffs believe that they have received right to sue letters, but no one has a copy of the letter and/or is able to produce a copy of the letter. In briefing, Plaintiffs have relied upon and produced a handful of EEOC charges and a handful of right to sue letters. Plaintiffs have consistently argued that all other Plaintiffs assert the "piggyback rule" either because he/she does not have a copy of his/her charge or letter or because he/she never filed a charge but seeks to "piggyback" upon the charge of others.

on May 1, 1998, then all Title VII claims are untimely.  (*Id*.).  There is no direct address of the continuing violations doctrine or the "piggyback" rule.

Under the continuing violations doctrine, a plaintiff may complain of otherwise time-barred discriminatory acts if it can be shown that the discrimination manifested itself over time, rather than in a series of discrete acts. *See Huckabay v. Moore,* 142 F.3d 233, 238–39 (5th Cir. 1998). However, in *Huckabay,* the Fifth Circuit confirmed the rule that discrete actions are not entitled to the shelter of the continuing violation doctrine. *Id.* at 239–40. Defendant implies that Plaintiffs only complain of separate and varied acts and decisions that occurred at different times many decades ago. Defendant does not address allegations contained in the EEOC charges or the complaint of systemic, ongoing, and pervasive discrimination based on race.  Based on these pleadings, charges, and the declarations submitted by Plaintiffs, the record confirms accusations of an organized, continuing and pervasive effort to discriminate.  A meaningful re-analysis of the timeliness of Plaintiffs' Title VII claims would necessarily entail a reconsideration of the application of the continuing violations doctrine, an issue which Defendant does not substantively address.

Additionally, the Court notes that Defendant seemed to take a step back from this issue when it replied to Plaintiffs' opposition.  In reply, Defendant remarked that Plaintiffs' pleading practice was "confusing" and even seemed to suggest that such practice had clouded the issue even for Defendant.  Defendant then focused primarily on the merits of Plaintiffs' claims, arguing that the record does not support Plaintiffs' claims and that they should be dismissed on these grounds. (*Id*.).  Based on the foregoing, the Court does not deem it necessary to re-visit the issue of timeliness of any of Plaintiffs' claims under Title VII.  This issue has already been addressed, and the Court cannot meaningfully re-visit the issue without considering the effect of any "continuing

violations". Therefore, the Court now turns to the analysis of the individual Plaintiffs' claims.

### 6.    Individual Plaintiffs

Based upon the foregoing, the claims to be analyzed on summary judgment are for a hostile work environment, disparate treatment and disparate impact based on racial discrimination. Defendant contends that Plaintiffs are unable to meet their burden on these claims and that the record reflects that there is insufficient evidence to support a genuine issue for trial.  The Court turns to each Plaintiff:

### Charles Adams

Adams was initiated into Local 198 in 1974.  (Doc. 804-5, p. 26).  He is a named Plaintiff in the original Complaint filed on May 1, 1998.  He filed a charge of discrimination on March 30, 2000, (Doc. 804-6), and received a right-to sue letter dated November 3, 2000.  In his charge, he states that he was denied a referral on November 18, 1999, and that he believes that he was discriminated against based on race because a white male was given the position that he was seeking.  (*Id.*, p. 3).

Adams testified that there were no blacks working regular, year-round maintenance and in skilled craft positions.  (Doc. 804-5, p. 31).  When he was on jobs, the white men were selected for "lineup", and he was told to "go with them", like he was an apprentice, because he was black.  (*Id.*, pp. 43-44).  Most recalls went to white men.  On one occasion, his name was called from the "out-of-work" list, but by the time he made it to the front, the job was given to someone else.  On another occasion, Adams was one of two men assigned to a job site.  When he arrived at the job site, he was sent home, and the white man was asked to stay and work.  (*Id.*, pp. 25-26, 28-31, 41-42).  Adams testified that Local 198 knew that Adams was a welder and available for a job but did not call him because he is black.  (*Id.*, pp. 34-40).  Adams testified that white men were allowed

to work non-union jobs, but black men were not. Adams testified to one occasion where he worked a non-union job and was "written up" for it, but white men were not. (Doc. 770-1, p. 2).

Adams completed a questionnaire which reflects that Local 198 had a policy of discrimination because blacks were not recognized as members but whites were, and blacks were not given a "fair shake" on the work, (Doc. 804-7, p. 2); Local 198 denied him employment based on discriminatory reasons, (*id*.); Local 198 denied him a job referral based on discriminatory reasons, (*id.*, p. 4); Local 198 denied him a job assignment based on discriminatory reasons, (*id.*, p. 5); Local 198 harassed him and retaliated against him based on discriminatory reasons, (*id.*, p. 6); Local 198 failed to defend him, (*id.*); Local 198 failed to recall him to a job based on discriminatory reasons, (*id.*, p. 7); Local 198 failed to promote him to a supervisory job based on discriminatory reasons, and he was injured by Local 198's discrimination, (*id.*); Adams brought the discriminatory actions to the attention of Local 198, (*id.*, p. 8); and Adams filed a charge with the EEOC regarding the acts of Local 198, (*id.*, p. 9).

Attached to the questionnaire was a handwritten statement that, in summary, represented the following: recalls went to white workers, not black, and even white workers who never worked for a contractor got the job before a black man, (*id.*, p. 12); Adams, a trained welder, lost a welding job to Adam Berthelot, who was not a trained, certified welder, (*id.*); black members were not made aware of some jobs until they were over, (*id.*, p. 14); the word "nigger" was used often, (*id.*, p. 15); white men were made foreman/supervisor and black men were not because white men did not want to work for black men, (*id.*, p. 16); and Adams was asked to go to Oklahoma to test for a job, but white men were allowed to fax their applications, (*id.*; Doc. 770-1, pp. 8-9).

Also attached to the questionnaire is a copy of a formal charge filed by Local 198 against Adams dated October 1, 1995. (Doc. 804-7, p. 18). It is signed by Jeff Armstrong regarding an

event on September 22, 1995, accusing Adams of not cooperating with a picket line. (*Id.*). A hearing was held on February 6, 1996, and Adams was fined $500.00. (*Id.*, p. 19). Adams complained of this incident in his questionnaire, and he described that he was followed by Armstrong and harassed about participation in a picket line. Adams describes that he was picking up a paycheck when this incident occurred, and he did not know anything about the picket line. (*Id.*). Adams testified in detail over this incident. (Doc. 804-5, pp. 3-24).

On June 30, 1997, Adams wrote a letter to Michael Collins, General Secretary-Treasurer, in Washington D.C. (Doc. 804-7, p. 21). Adams' "letter of appeal" was regarding "unfair" treatment by Mr. LeBlanc and Mr. Armstrong at Local 198. Adams explains that Local 198 did not give him a referral that he was supposed to receive. Local 198 also would not let him pay dues and would not let him purchase stamps. He was also fined for completing work, although the terms of this complaint are unclear from the letter. Adams sought review of the procedure, charge and fine. (*Id.*). Adams testified that his claim was not thoroughly investigated, and he was treated differently because he is black. (Doc. 770-1, pp. 7-8).

In order to defeat summary judgment as to his hostile work environment claim, Adams must present evidence that a genuine issue exists to be tried as to the elements of that claim. The record evidence, summarized above, does not exhibit an environment permeated by discriminatory intimidation, ridicule and insult that was severe and pervasive and altered the conditions of Adams' employment and created an abusive working environment. While the record evidence reflects instances of unfair treatment allegedly based on race, the timeline of Adams' events does not reflect frequency of discriminatory conduct, severity, physical threat or humiliation, and interference with Adams' work performance. *Stewart*, 586 F.3d at 328; *Ramsey*, 286 F.3d at 268. As Defendant argues, no reasonable fact finder could find that Plaintiffs' established that there was

53

intentional, pervasive, and regular racial discrimination of which Local 198's supervisors and management were aware and which Local 198 permitted to continue. (Doc. 737-2, p. 15, citing *Celestine*, 266 F.3d at 354).

On the other hand, Plaintiffs offered evidence in support of a *prima facie* case of disparate treatment based on racial discrimination - that Adams was a member of a protected class, that he was treated differently than white men for jobs for which Adams was qualified, that he suffered adverse employment actions due to his race. *McCormick*, at *2; *Hill*, 918 F.2d at 1238; *Vaughn*, 918 F.2d at 521. While Defendant offered affidavit testimony to dispute the disparate treatment of all Plaintiffs based on race, (Doc. 737-4), the record evidence sufficiently supports that a genuine issue of material fact remains for trial on Adams' disparate treatment claim.

Further, Plaintiffs explained how the recall and call-back procedures were designed to work, facially neutral policies where the contractor was in charge of who was recalled, etc. However, Plaintiffs explained and offered evidence in support of the allegation that Local 198 would choose the supervisors for the job, all white men. The white men would report to the contractor and then tell the contractor which workers to call-back . Thus, Local 198, by controlling who the supervisors were, thereby controlled which workers were called for jobs, resulting in white men obtaining the jobs. (Doc. 770, pp. 2-10, 25, 30, 32-33). *Pacheco*, 448 F.3d at 791-92. Adams offered evidence of never being promoted to supervisor and not being called for jobs in various scenarios. Again, Defendant offered conflicting testimony detailing that the procedure was neutral on its face and applied in accordance with the collective bargaining agreements in place. (Doc. 737-4). Defendant does not deny that contractors may be discriminatory in their list of names for jobs, but Defendant argues that that Local 198 does not control its contractors and the contractors must answer for their own actions. Defendant does not specifically address Plaintiffs' argument

that Defendant may be calling members for jobs from the list of names provided by the contractor, but that list was developed by a Local 198 member who was appointed supervisor by Local 198. This evidence created an issue of fact for trial regarding Adams' disparate impact claim.

Based on the applicable law, facts, and record evidence as set forth above, the Court finds that there is no genuine issue of material fact as to Adams' hostile work environment claim, and this claim is <u>dismissed with prejudice</u>. Further, only Defendant loosely utilized the *McDonnell Douglas* framework in analyzing Plaintiffs' disparate treatment and disparate impact claims. Even so, and based on the law, facts and evidence set forth above, the Court finds that there is a genuine issue of material fact regarding Adams' disparate treatment and disparate impact claims; therefore, Defendant's motion is <u>denied</u> as to these claims.

### Larry Bell

Defendant argues that Bell's claims are "mainly untimely". (Doc. 737-2, p. 26).

Bell testified about discrimination in the workplace, including being given work assignments that were much harsher than those assigned to white men; being the subject of practical jokes because he is black; being laid off/losing his job because there were too many black people on the job; and instances of white workers refusing to work with him because he is black. (Doc. 737-11, pp. 3, 21-25, 29-33). He testified that in his time with Local 198, he never saw a black instructor "at the Hall". However, he admitted that he never applied to be an instructor. Therefore, while he noticed disparate hiring in the instructors, he was not discriminated against based on race for an instructor position. (*Id.*, pp. 8-9). On the other hand, while Bell testified that there were few black foremen, he was made a general foreman and served as a steward at certain jobs. (*Id.*, pp. 4-8).

Defendant admits that Bell's "only potentially timely claim of racial harassment" was that he saw a noose at a work site the week before his deposition. He complained to the foreman, but no action was taken. (Doc. 737-2, p. 26, citing Doc. 737-11, pp. 26-28). Defendant argues any claim of harassment regarding the noose incident should be made against the contractor (Rubicon in this instance), and not Local 198. Defendant further argues that "even so, a single incident would not constitute a hostile work environment". (*Id.*, p. 26). To the contrary, allegations and evidence of an incident involving a noose and of racial epithets and other discriminatory behavior rise to a highly egregious level of harassment and humiliation. *See Abner v. Kansas City Southern R. Co*., 513 F.3d 154, 163 (5th Cir. 2008)(punitive damages awarded for wire noose display found to be "reprehensible discrimination" and "most egregious discrimination" under Title VII); *Fennell v. Marion Independent School Dist*., 804 F.3d 398, 409 (5th Cir. 2015)(noose and racial epithets evidence a "severe, pervasive and objectively offensive nature of … harassment").

Bell testified that few recalls went to black men. Although recalls are supposed to come from contractors, he believes that the business manager with Local 198 has "influence" on who is recalled. (Doc. 737-11, pp. 13-16). Bell testified that white men were assigned more out of town jobs than he was, and this is because he is black. (*Id.*, p. 17). Bell also testified that no black Local 198 members have been elected to attend the annual convention as delegates. There were no black clerks employed by the "Union Hall". (*Id.*, pp. 10-11).

Plaintiffs offer and rely upon the Declaration of Larry Bell in support of Plaintiffs' claims. (Doc. 770-13). In his declaration, Bell declares: that he was a member of Local 198 from 1975 to 2013, (*id.*, p. 1); the business manager for Local 198 told his apprenticeship class that there are "too many of you", meaning black people, (*id.*, p. 2); the business manager for Local 198 also told his class that they would "never retire from the Local", (*id.*); white workers got recalls and black

members did not, (*id.*); Local 198 would wait for white workers to arrive before posting jobs or call their white friends to come to the hall to pick up a work order, (*id.*, p. 3); Mr. Zumo with Local 198 told Bell that he would never win this lawsuit because "they" put Judge Tyson on the bench and Judge Tyson would "go with them", (*id.*); Bell reported to jobs and saw other members already working on the job even though the job had not been posted, (*id.*); Louis LeBlanc sent his friends to jobs and never posted them.  Bell was passed over for these jobs even though he had been on the books.  This went on for years, (*id.*); black workers could only get a recall if they had worked for the contractor in the past six months but white workers got recalls when they had not worked for the contractor for years, (*id.*); despite Louis LeBlanc's affidavit that call-outs and recalls were posted on the board at the same time, they were not.  This is not correct, (*id.*); Bell witnessed Local leadership saving jobs for their friends and the people who elected them, (*id.*); Louis LeBlanc admitted to Bell that he was KKK, (*id.*, pp. 3-4); blacks were the first to be laid off, and leadership only named black members as foremen after this lawsuit was filed, (*id.*, p. 4); Local 198 members were the supervisors and they chose the foremen.  Despite being one of the best pipefitters, Bell was never made foreman in 15 years, (*id.*, p. 5); race discrimination in the call out procedure was ongoing and was occurring in 2013 when Bell retired, (*id.*, pp. 5-6); and bringing the Grand Duke of the KKK to speak at the Hall was "very hostile", (*id.*, p. 6).  *See Brown v. Coca-Cola Bottling Company United, Inc*., Civ. A. No. 19-96, 2019 WL 6702422, * 4 (M.D. La. Dec. 9, 2019)(reasonable to find that a juror would consider a KKK symbol on a drink machine intended for an African American worker to be "intimidating"), and *Abner v. Kansas City Railway Co*., 2005 WL 8168285, *2 (W.D. La. Jun. 14, 2005) (KKK membership of a supervisor considered "probative" and "relevant" to a hostile work environment); *but see Cargo v. Kansas City Southern Railway Co*., 2012 WL 14030, * 3 (W.D. La. Jan. 4, 2012), citing *Lindsey v. Chevron USA Inc.,*

2002 WL 31415255 (5th Cir. 2002) (KKK symbols not found to contribute to a hostile work environment). *See also Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1266 (7th Cir. 1991) (finding summary judgment for defendant inappropriate where plaintiff endured "nigger" jokes over ten years, his co-workers hung a "human-sized dummy with a black head" from a doorway, and someone scrawled "KKK" and "All niggers must die" onto the bathroom walls).

In order to defeat summary judgment as to his hostile work environment claim, Bell must present evidence that a genuine issue exists to be tried as to the elements of that claim. The record evidence, summarized above, reflects that a reasonable jury may find an environment permeated by discriminatory intimidation, ridicule and insult that was severe and pervasive and altered the conditions of Bell's employment and created an abusive working environment. The record evidence suggests that the discriminatory behavior was frequent, severe (*i.e.*, noose, KKK), threatening, and possibly interfered with Bell's work performance. *Stewart*, 586 F.3d at 328; *Ramsey*, 286 F.3d at 268. A reasonable fact finder could find that Plaintiffs established that there was intentional, pervasive, and regular racial discrimination of which Local 198's supervisors and management were aware and which Local 198 permitted to continue. *Celestine*, 266 F.3d at 354.

Plaintiffs also offered evidence in support of a *prima facie* case of disparate treatment based on racial discrimination - that Bell was a member of a protected class, that he was treated differently than white men for jobs for which Bell was qualified, and that he suffered adverse employment actions due to his race. *McCormick*, at *2; *Hill*, 918 F.2d at 1238; *Vaughn,* 918 F.2d at 521. While Defendant offered affidavit testimony to dispute the disparate treatment of all Plaintiffs based on race, (Doc. 737-4), the record evidence sufficiently supports that a genuine issue of material fact remains for trial on Bell's disparate treatment claim.

Further, Plaintiffs explained how the recall and call-back procedures were designed to work, facially neutral policies where the contractor was in charge of who was recalled, etc. However, Plaintiffs explained and offered evidence in support of the allegation that Local 198 would choose the supervisors for the job, all white men. The white men would report to the contractor and then tell the contractor which workers to call-back . Thus, Local 198, by controlling who the supervisors were, thereby controlled which workers were called for jobs, resulting in white men obtaining the jobs. (Doc. 770, pp. 2-10, 25, 30, 32-33). *Pacheco*, 448 F.3d at 791-92. Bell offered additional evidence of black men, including himself, being affected by the faulty callback procedure. Again, Defendant offered conflicting testimony detailing that the procedure was neutral on its face and applied in accordance with the collective bargaining agreements in place. (Doc. 737-4). Defendant does not deny that contractors may be discriminatory in their list of names for jobs, but Defendant argues that that Local 198 does not control its contractors and the contractors must answer for their own actions. Defendant does not specifically address Plaintiffs' argument that Defendant may be calling members for jobs from the list of names provided by the contractor, but that list was developed by a Local 198 member who was appointed supervisor by Local 198. This evidence creates an issue of fact for trial regarding Bell's disparate impact claim.

Based on the applicable law, facts, and record evidence as set forth above, the Court finds that there is a genuine issue of material fact regarding Bell's hostile work environment, disparate treatment and disparate impact claims; therefore, Defendant's motion is denied as to Bell's claims.

### Frank Cage

Defendant seeks to dismiss all of Frank Cage's pending claims; however, because Frank Cage previously represented to the Court that he did not oppose Defendant's motion, Frank Cage was dismissed with prejudice on December 18, 2019. (Doc. 757, p. 3).

**Yvonne Catherine (1 of 3 heirs of Joseph Catherine)**

Yvonne Catherine, Umeca O'Conner, and Corey Catherine are the heirs of Joseph Catherine. Joseph Catherine was a member of Local 198 from approximately 1989 through, at least, 2002, the time of his deposition. (Doc. 737-14, pp. 3-4). He passed away on June 17, 2005. (Doc. 543). Defendant's primary challenge to Joseph Catherine's claims is based on timeliness. (Doc. 737-2, p. 29). The timeliness of his claims was addressed in this Court's prior ruling. (Doc. 700). Only Joseph Catherine's claims under state law and Section 1981 remain pending as a result of that prior ruling.

Catherine complains that certain policies were administered in a disparate fashion. For example, white males with high blood pressure were allowed to work, but black workers with high blood pressure were not.[18] Catherine testified that the reason he filed suit against Local 198 was due to the recall system. He testified that he was discriminated against due to the way in which jobs were assigned. Specifically, he testified that the recall procedure was unfair. When Defendant showed him a work history that purportedly showed four times that Catherine was recalled, Catherine testified that at least one instance was incorrect as he did not obtain the job through recall. He did not remember the other instances. (Doc. 737-14, pp. 5-7). Plaintiffs also show that Catherine testified that he complained to Sammy Graphia and Gene Porciau, both of Local 198, about being discriminated against based on race in the job assignment process. He further testified that Sammy Graphia told him that his "hands were tied" and there was nothing he could do about it. (Doc. 770-23, pp. 3-4).

Catherine explained in detail that the call-back and recall procedures were discriminatory. He explained that the procedure is administered such that there is "no way" a member knows

---

[18] Defendant cites to Catherine's deposition, pages 17 and 45. Excerpts of Catherine's deposition are in the record at Doc. 737-14; however, pages 17 and 45 are not included.

whether they would have had "a chance at a particular job". This is because Local 198 would not post the recalls. Local 198 would verbally announce a name of someone who was recalled. There was no way for black members to "really check" and determine if that person was recalled or not. Also, Catherine testified that his name would be on the books for months before his name would "come up". However, if "a guy just steps up in front of you and says he was recalled", he would not get the job. (Doc. 737-14, pp. 9-10).

Defendant responded to Plaintiffs' argument by stating, "This simply demonstrates that [P]laintiffs' allegations that the call out/recall systems are discriminatory are just assumptions and not fact-based." (Doc. 786, p. 10). Defendant points to "LeBlanc's testimony, and now Miller's, that these calls by name were contractual provisions sought by contractors, not the Union, and that the calls by name came from the contractors." (*Id.*). However, this is belied by Plaintiffs' argument. Plaintiffs do not dispute the "contractual provisions". Rather, Plaintiffs argue that Local 198 and the contractors took actions to work around the collective bargaining agreements, and Catherine testified that there was no way to know or "really check" that the procedure was being correctly administered. Although Defendant presents testimony of LeBlanc and Miller in support of their argument, Plaintiffs equally present testimony supporting theirs, thereby creating an issue of fact.

Defendant concludes its challenge of Catherine's claims by stating that "no heir has been substituted on his behalf". (Doc. 737-2, p. 30). Defendant acknowledges that Plaintiffs filed a motion, seeking to substitute the heirs as Plaintiffs. (Doc. 737-2, p. 29, citing Doc. 527). Defendant then claims that "a search of the record has not revealed" that this motion was granted. (*Id.*). However, the Court was able to confirm that Plaintiffs' motion was granted. *See* Doc. 543. Therefore, the heirs have been substituted as proper party plaintiffs.

In order to defeat summary judgment as to his hostile work environment claim, Catherine, must present evidence that a genuine issue exists to be tried as to the elements of that claim. The record evidence, summarized above, does not exhibit an environment permeated by discriminatory intimidation, ridicule and insult that was severe and pervasive and altered the conditions of Catherine's employment and created an abusive working environment. While the record evidence reflects instances of unfair treatment allegedly based on race, the record does not reflect frequency of discriminatory conduct, severity, physical threat or humiliation, and interference with Catherine's work performance. *Stewart*, 586 F.3d at 328; *Ramsey*, 286 F.3d at 268. *See* the analysis above regarding Adams' hostile work environment claim.

On the other hand, Plaintiffs offered evidence in support of a *prima facie* case of disparate treatment based on racial discrimination - that Catherine was a member of a protected class, that he was treated differently than white men for jobs for which Catherine was qualified, that he suffered adverse employment actions due to his race. *McCormick*, at *2; *Hill*, 918 F.2d at 1238; *Vaughn,* 918 F.2d at 521. While Defendant offered affidavit testimony to dispute the disparate treatment of all Plaintiffs based on race, (Doc. 737-4), the record evidence sufficiently supports that a genuine issue of material fact remains for trial on Catherine's disparate treatment claim.

By the same token, Plaintiffs explained how the recall and call-back procedures were designed to work, facially neutral policies where the contractor was in charge of who was recalled, etc. However, Catherine testified that Local 198 would verbally call whoever they chose to, and because the actual names of the members who were "up" for the job were never posted or disclosed, the workers could not prove that Local 198 was calling the wrong person. Catherine also testified that his name was "on the books" for months, and others would "walk up" before

him and get the job.  Catherine testified that he complained of being passed over for jobs and the inequities of the recall and call back procedures.  Nothing was ever done.

Again, Defendant offered conflicting testimony detailing that the procedure was neutral on its face and applied in accordance with the collective bargaining agreements in place.  With regard to Catherine's remaining claims, which are solely under state law and Section 1981, Defendant argues that Catherine must show intentional discrimination.  (Doc. 786, p. 10, citing La. R.S. 23:332, *National Ass'n of Gov't Employees v. City Pub. Serv. Bd*., 40 F.3d 698, 714-15 (5th Cir. 1994), *Gray v. Entergy Operation, Inc*., 240 F.3d 1074 (5th Cir. 2000)).  While Defendant's legal argument is well-founded, it does not overcome the genuine issue of fact as to whether Defendant discriminated against Catherine based on race, intentionally or not, in its call-back, recall and job assignment procedures.

Based on the applicable law, facts, and record evidence as set forth above, the Court finds that there is no genuine issue of material fact as to Catherine's hostile work environment claim, and this claim is <u>dismissed with prejudice</u>.  However, the Court finds that there is a genuine issue of material fact regarding Catherine's disparate treatment and disparate impact claims; therefore, Defendant's motion is <u>denied</u> as to these claims.

### Umeca O'Conner (2 of 3 heirs of Joseph Catherine)

The same analysis set forth above regarding Plaintiff Yvonne Catherine, one of the heirs of Joseph Catherine, applies to Plaintiff Umeca O'Conner.  For the reasons stated immediately above, Umeca O'Conner's claims of a hostile work environment are <u>dismissed with prejudice</u>. Defendant's motion regarding claims of disparate treatment and disparate impact is <u>denied</u>.

### Corey Catherine (3 of 3 heirs of Joseph Catherine)

63

The same analysis set forth above regarding Plaintiff Yvonne Catherine, one of the heirs of Joseph Catherine, applies to Plaintiff Corey Catherine. For the reasons stated immediately above, Corey Catherine's claims of a hostile work environment are <u>dismissed with prejudice</u>. Defendant's motion regarding claims of disparate treatment and disparate impact is <u>denied</u>.

### Joseph Collins

Defendant seeks to dismiss all of Joseph Collins' pending claims; however, because Joseph Collins previously represented to the Court that he did not oppose Defendant's motion, Joseph Collins was dismissed with prejudice on December 18, 2019. (Doc. 757, p. 3).

### Leo Davis

Leo Davis' claims were the subject of Defendant's prior motion on timeliness. As a result of this Court's prior ruling, only Davis' claims under state law and Section 1981 remain pending. (Doc. 700). Davis did not appear for his deposition and has only responded, in part, to the Intake Questionnaire. While Defendant acknowledges the Intake Questionnaire and relates some of Davis' complaints to it, Defendant does not direct the Court to the questionnaire in the record. There is no citation to any exhibit number. (Doc. 737-2, pp. 31-32).

In opposition to Defendant's motion, Plaintiffs do not provide Davis' Intake Questionnaire, a declaration, or any other evidence in support of Davis' claims. Rather, Plaintiffs argue that Davis was "denied access" to a class in the apprenticeship school. No evidentiary support, legal argument or legal authority is provided. (Doc. 770, p. 40). Instead, Plaintiffs highlight the Declarations of Larry Bell and Sam Parker as evidence of discrimination related to the apprenticeship school. (*Id.*). Plaintiffs then quote the Declaration of Willie Stone in support of discrimination with regard to job assignments. (*Id.*, p. 41). Plaintiffs conclude with a sweeping

64

and conclusory assertion that David Duke, Grand Wizard of the KKK, was invited to the Union Hall and that racial discrimination was "targeted at all African Americans". (*Id.*, p. 42).

The record evidence and arguments on summary judgment are woefully inadequate to support the remaining claims of Leo Davis. In fact, no party directs the Court to any record evidence supporting Davis' claims of a hostile work environment or disparate treatment/impact. Although Plaintiffs argue the presence of KKK representatives at Local 198, this is not Davis' testimony or complaint. There is no evidence that Davis was intimidated, harassed or negatively impacted, much less knowledgeable, by any event or circumstance related to the KKK. Unlike Larry Bell, there is no evidence supporting Davis' claims and showing that he can meet his burden. There is no evidence of a genuine issue of fact suitable for trial with regard to Davis' claims.

Based on the applicable law, facts, and record evidence as set forth above, the Court grants Defendant's motion with regard to Leo Davis' claims. Davis' claims of racial discrimination and hostile work environment under state law and Section 1981 are <u>dismissed with prejudice</u>.

### David Dixon

Dixon is a named Plaintiff in the original complaint filed on May 1, 1998. (Doc. 1). He filed a charge of discrimination on March 5, 2001 and received a right-to sue letter dated March 9, 2001. (Doc. 804-8). In his charge, he states that he was denied recall based on his race on November 8, 2000, and in the "300 days" before that. He charges that journeymen and apprentices are recalled on a daily basis, yet no blacks have been recalled "in the last 300 days". (*Id.*).

Defendant argues that Dixon complained "without explanation" that the assessments for the apprenticeship program are a "forgery". (Doc. 804-1, p. 13, citing Doc. 804-9, p. 14). However, a review of the excerpts of Dixon's deposition testimony provided reflect that he testified to a discriminatory incident when he was looking for a job, and the complete testimony is

not provided.  Defendant only provided the page of Dixon's deposition transcript where he stated that a policy was "forgery" in his opinion, that this was not contained in his questionnaire, and the following pages are not provided.  (Doc. 804-9, pp. 14-15).

Dixon testified to training that was offered by Local 198, but black members were "excluded" and did not know about the training until after it had occurred.  (*Id.*, pp. 23, 25).  Dixon testified, as other Plaintiffs have likewise testified, that LeBlanc selected and appointed the supervisors and foremen for jobs.  These jobs "rarely", if ever, went to black men.  The supervisors and foremen would then report to the job and select the workers for the job.  This process led to black men not getting call-outs, call-backs, and referrals, or job assignments in general.  Local 198 was indirectly choosing white men over black men for jobs.  (*Id.*, pp. 27-30).  Defendant argues LeBlanc's testimony, again, that the employer appoints the foreman and that LeBlanc "very rarely" appoints the steward.  (Doc. 737-4).

Dixon testified that in 16 years, he received one recall.  White men worked year-round.  (Doc. 804-9, pp. 11-12).  He also explained that the referral procedure was discriminatory because black members had to physically visit the hall rather than obtain information over the phone.  Dixon testified that he would not receive a response over the phone unless he "made his voice sound white".  (*Id.*, pp. 8-11).  Dixon testified that he was told that it would "embarrass" the union if he went to an out-of-town job without a work order, but white workers did this all the time.  (*Id.*, p. 16).  He testified to at least one instance where the union told him that there were no jobs, but his friend told him otherwise.  When he went to Ohio, he got the job.  (*Id.*, pp. 17-18).

Dixon testified that there were no black members on the union's board or employed in the union's office.  (*Id.*, p. 30).  Defendant also states in its motion that Dixon testified that he was

supposed to "go as a Union salt[19] at Liquid Carbonic to unionize a job in 1997, but when some whites got money he asked Jeff Armstrong if they would get money and was told that his name was not on the list."  (Doc 804-1, p. 14, citing Doc. 804-9, pp. 53-56, 80).  However, the cited pages of Dixon's deposition testimony are not included at Doc. 804-9.

With regard to his hostile work environment claim, Dixon "does not contest" Defendant's motion as to this claim. (Doc. 842, p. 1).  Therefore, Dixon's hostile work environment claim is dismissed with prejudice.

Dixon only contests Defendant's motion regarding his claims related to referrals, recalls, and road jobs.  (*Id.*). Plaintiffs offered evidence in support of a *prima facie* case of disparate treatment based on racial discrimination - that Dixon was a member of a protected class, that he was treated differently than white men for jobs for which Dixon was qualified, and that he suffered adverse employment actions due to his race.  *McCormick*, at *2; *Hill*, 918 F.2d at 1238; *Vaughn*, 918 F.2d at 521.  While Defendant offered affidavit testimony to dispute the disparate treatment of all Plaintiffs based on race, (Doc. 737-4), the record evidence sufficiently supports that a genuine issue of material fact remains for trial on Dixon's disparate treatment claim.

Further, Plaintiffs explained how the recall and call-back procedures were designed to work, facially neutral policies where the contractor was in charge of who was recalled, etc. However, Plaintiffs explained and offered evidence in support of the allegation that Local 198 would choose the supervisors for the job, all white men.  The white men would report to the contractor and then tell the contractor which workers to call-back .  Thus, Local 198, by controlling who the supervisors were, thereby controlled which workers were called for jobs, resulting in white

---

[19] "Salting" is a labor union tactic involving the act of getting a job at a specific workplace with the intent of organizing a union.  A person so employed is called a "salt".  *Wikipedia*, (citing "Organizing Under Cover (Salting)", Industrial Workers of the World, posted May 8, 2005).

men obtaining the jobs.  (Doc. 770, pp. 2-10, 25, 30, 32-33).  *Pacheco*, 448 F.3d at 791-92.  Dixon

offered evidence of only white men being appointed to supervisor and foreman positions and of

not being informed about jobs or given the same opportunities for jobs as white men.  Again,

Defendant offered conflicting testimony detailing that the procedure was neutral on its face and

applied in accordance with the collective bargaining agreements in place.   (Doc. 737-4).

Defendant does not deny that contractors may be discriminatory in their list of names for jobs, but

Defendant argues that that Local 198 does not control its contractors and the contractors must

answer for their own actions.  Defendant does not specifically address Plaintiffs' argument that

Defendant may be calling members for jobs from the list of names provided by the contractor, but

that list was developed by a Local 198 member who was appointed supervisor by Local 198.  This

evidence creates an issue of fact for trial regarding Dixon's disparate impact claim.

Based on the applicable law, facts, and record evidence as set forth above, the Court finds

that there is a genuine issue of material fact regarding Dixon's disparate treatment and disparate

impact claims; therefore, Defendant's motion is <u>denied</u> as to these claims.

### Wayne Dukes

Dukes did not give his deposition testimony.  He provided an Intake Questionnaire that

Defendant claims is incomplete.  (Doc. 737-2, p. 32, citing Doc. 737-16).  Dukes' questionnaire

reflects: allegations of a policy of discrimination, (Doc. 737-16, p. 2); that Dukes paid dues for 15

years but was "denied a book" and was "fired" without any representation by the union, (*id.*);

Dukes was denied work based on his race "because the steward was not right", (*id.*);   Dukes was

denied membership based on racial discrimination by the steward and business agent, (*id.*, p. 3);

Dukes reported this to the stewards many times and was told that they are not "giving out books",

(*id.*); Dukes was denied a job referral based on racial discrimination, (*id.*, p. 4); Dukes was denied

job assignments based on racial discrimination, (*id.*, p. 5); Dukes claims he was harassed and the word "nigger" was used, (*id.*, p. 6); Dukes claims that he was retaliated against by being denied representation because he is black, (*id.*); Dukes claims that he was subjected to a hostile work environment because "race words were used" and Dukes states that he would ignore "them" or laugh, (*id.*); and he was not recalled based on his race, (*id.*, p. 7).

Attached to the questionnaire was a letter from the United Association to Fred Woods, Director of Human Resources, dated March 9, 1992, regarding an error in the chain of custody with regard to a drug sample taken from Dukes. (*Id.*, p. 13). Additional letters were also attached regarding the prosecution and dropping of charges related to a drug test. Defendant argues that it is unclear what claims Dukes is bringing, but it appears that he may be bringing a claim of breach of duty of fair representation, which claims expire after six months. (Doc. 737-2, p. 32).

Plaintiffs respond by first arguing the timeliness of Dukes' claims. (Doc. 795, p. 5). Plaintiffs make general arguments that Dukes' claims are the same as "all other claimants" and that he did not like being called "nigger". (*Id.*, p. 6). Plaintiffs then describe an affirmative action program in the early 1990's. (*Id.*, p. 7). No evidence is cited or legal authority provided.

Dukes submitted a declaration in support of his opposition. (Doc. 795-2). The declaration is signed, notarized, and dated January 23, 2020. (*Id.*, p. 6). The declaration provides that Dukes: was a member since 1978, (*id.*, p. 1); was terminated by Copolymer in 1993 and he tried to "get help" from Local 198 with representation, (*id.*); was not provided any assistance by Local 198, (*id.*, p. 2); was called "nigger" and was offered no assistance, (*id.*); claims that on jobs, "they used to hang the ropes to scare us when we worked on tanks and the Local 198 did nothing about that", (*id.*, p. 4); never got a book even though he paid dues, (*id.*); was subjected to different rules as a black man than the white men, such as whites did not have to attend school or be on time but black

men did, (*id.*); had to work in the dirtiest areas as a black man, but white men did not, (*id.*); recalls were not put on the board, and white workers were sent to Exxon while the black workers were on shut down and drawing unemployment, (*id.*, p. 5); had drug tests administered to him but not to the whites, and the only two people who were drug tested were black, (*id.*); and the business agent said that they were targeting blacks with drug tests so that they would be fired, (*id.*).

In order to defeat summary judgment as to his hostile work environment claim, Dukes must present evidence that a genuine issue exists to be tried as to the elements of that claim.  The record evidence, summarized above, reflects that a reasonable jury might find an environment permeated by discriminatory intimidation, ridicule and insult that was severe and pervasive and altered the conditions of Dukes' employment and created an abusive working environment.  The record evidence is unclear whether the discriminatory behavior was frequent, but suggests that it was severe (*i.e.*, hanging ropes, racial epithets), threatening, and possibly interfered with Dukes' work performance.  *Stewart*, 586 F.3d at 328; *Ramsey*, 286 F.3d at 268.  A reasonable fact finder could find that Plaintiffs established that there was intentional, pervasive, and regular racial discrimination of which Local 198's supervisors and management were aware and which Local 198 permitted to continue.  *Celestine*, 266 F.3d at 354.  *See* the Court's analysis of Bell's hostile work environment claim.

Plaintiffs also offered evidence in support of a *prima facie* case of disparate treatment based on racial discrimination - that Dukes was a member of a protected class, that he was treated differently than white men for jobs for which Dukes was qualified, and that he suffered adverse employment actions due to his race.  *McCormick*, at *2; *Hill*, 918 F.2d at 1238; *Vaughn,* 918 F.2d at 521.  While Defendant offered affidavit testimony to dispute the disparate treatment of all

Plaintiffs based on race, (Doc. 737-4), the record evidence sufficiently supports that a genuine issue of material fact remains for trial on Dukes' disparate treatment claim.

Further, Dukes provided a declaration providing how he was denied fair representation by Local 198, how white men were treated differently with regard to work and jobs and how he was assigned to the dirtiest jobs, among other attestations. He specifically attested to the disparity in the administration of the drug testing policy. Defendant responded to these arguments by challenging the validity of the declaration, the relevancy of the attestations, and arguing that the attestations were conclusory, vague and irrelevant. However, Dukes, unlike some others, has come forward with some evidence, his own personal testimony of disparate treatment and disparate impact to him based on his race. This evidence creates an issue of fact for trial regarding Dukes' disparate impact claim. *See also* the analysis on Adams' disparate impact claim.

Based on the applicable law, facts, and record evidence as set forth above, the Court finds that there is a genuine issue of material fact regarding Dukes' hostile work environment, disparate treatment and disparate impact claims; therefore, Defendant's motion is <u>denied</u> as to Dukes' claims.

### Earnest Ford, Sr.

Defendant seeks to dismiss all of Earnest Ford, Sr.'s pending claims. (Doc. 737). Earnest Ford, Sr. represents in both joint charts that he has no opposition to Defendant's motion. (Doc. 773, p. 2; Doc. 843, p. 1). All claims by Earnest Ford, Sr. are <u>dismissed with prejudice</u>.

### Lee Fox

Lee Fox is named as a Plaintiff in the original complaint. (Doc. 1). He filed an EEOC charge on March 5, 2001, but Defendant does not cite to the charge in the record. Fox was the

subject of the prior motion on the timeliness of Plaintiffs' claims. As a result of that prior ruling, only Fox's claims under state law and Section 1981 remain pending. (Doc. 700).

Fox testified to the following: that specialized training for pipefitters was offered to others but never posted, and this training led to higher paying jobs, (Doc. 804-10, pp. 13-17); that he was given the "nasty, dirty, hard" work, but he did not complain to anyone about it, (*id.*, pp. 10-12); the recall system was not dictated by contractors, only by Local 198 because they voted on it, (*id.*, pp. 3-4); the recall procedure is designed such that a worker must work for the contractor for a period of time before qualifying for a recall, but Louis LeBlanc did not run the recall procedure that way, (*id.*, pp. 5-6); when call outs were done in the hall, it was almost entirely white men, (*id.*, pp. 7-9); over the course of decades, Fox was called a "nigger" and other racial epithets, and he testified to racial harassment and epithets in the workplace by Local 198, (*id.*, pp. 18-24, 28-31); there was disparate treatment with blood pressure tests in that he was not allowed to work with "high" blood pressure, but "others" had been cleared to work with high blood pressure, (*id.*, pp. 25-27); and he has had at least one instance of harassment for being black since suit was filed, (*id.*, pp. 28-29).

Plaintiffs offered the Declaration of Fox, which provides the following: it is signed and notarized, but there is no date, (Doc. 770-12); Fox was a member of Local 198 from 1974 until 1998, (*id.*, p. 1); the recall procedure was not followed, and white workers received recalls at a rate of 5 to 1, (*id.*, p. 2); Local 198 waited for white workers to show up at the hall to post a job or called their white friends to assign jobs, (*id.*); recalls were not put on the board or were only put on the board after everyone had work orders or had left, (*id.*); he heard others talking about Louis LeBlanc being racist and a member of the KKK, (*id.*, p. 3); black members had to clean up, but

white members did not, (*id.*, p. 4); and, white members got out earlier and black members did not, (*id.*).

In order to defeat summary judgment as to his hostile work environment claim, Fox must present evidence that a genuine issue exists to be tried as to the elements of that claim. The record evidence, summarized above, does not reflect that a reasonable jury might find an environment permeated by discriminatory intimidation, ridicule and insult that was severe or pervasive and altered the conditions of Fox's employment and created an abusive working environment. The record evidence does not suggest that the discriminatory behavior was frequent, severe and pervasive, threatening, and possibly interfered with Fox's work performance. *Stewart*, 586 F.3d at 328; *Ramsey*, 286 F.3d at 268. Although Fox specifically testified that harassment was a part of the everyday job, the complaints did not rise to the level of a "hostile work environment" under the law. *See* the Court's analysis of Adams' hostile work environment claim.

Plaintiffs offered evidence in support of a *prima facie* case of disparate treatment based on racial discrimination - that Fox was a member of a protected class, that he was treated differently than white men for jobs for which Fox was qualified, and that he suffered adverse employment actions due to his race. *McCormick*, at *2; *Hill*, 918 F.2d at 1238; *Vaughn,* 918 F.2d at 521. While Defendant offered affidavit testimony to dispute the disparate treatment of all Plaintiffs based on race, (Doc. 737-4), the record evidence sufficiently supports that a genuine issue of material fact remains for trial on Fox's disparate treatment claim.

Further, Plaintiffs explained how the recall and call-back procedures were designed to work, facially neutral policies where the contractor was in charge of who was recalled, etc. However, Fox testified as to how the contractors had no control over who was assigned and that Louis LeBlanc controlled who was assigned to a job, all white men. Jobs were not posted on the

board, instead, the jobs were fed to the white workers.  Thus, Local 198 controlled which workers were called for jobs, resulting in white men obtaining the jobs.  (Doc. 770, pp. 2-10, 25, 30, 32-33).  *Pacheco*, 448 F.3d at 791-92.  Fox offered evidence of only white men being appointed to jobs at a 5 to 1 ratio over blacks or given better opportunities for jobs.  Again, Defendant offered conflicting testimony detailing that the procedure was neutral on its face and applied in accordance with the collective bargaining agreements in place.  (Doc. 737-4).  Defendant does not deny that contractors may be discriminatory in their list of names for jobs, but Defendant argues that that Local 198 does not control its contractors and the contractors must answer for their own actions.  This evidence creates an issue of fact for trial regarding Fox's disparate impact claim.  *See* the Court's analysis of Catherine's disparate impact and disparate treatment claims.

Based on the applicable law, facts, and record evidence as set forth above, the Court finds that there is no genuine issue of material fact regarding Fox's hostile work environment claims, and it is <u>dismissed with prejudice</u>.  A genuine issue of material fact exists as to Fox's disparate treatment and disparate impact claims; therefore, Defendant's motion is <u>denied</u> as to these claims.

### Larry Freeman

Larry Freeman was the subject of Defendant's prior motion on the timeliness of Plaintiffs' claims.  As a result of that prior ruling, only Freeman's claims under state law and Section 1981 remain pending.  (Doc. 700).

Freeman testified to the following: that whites received more training on pipefitting than blacks, and he was not educated in pipefitting, (Doc. 804-11, pp. 24-25); that he was never made aware of a special welding class because it was never posted and only white males attended, (*id.*, p. 37); that he applied to be the director of the apprenticeship school and lost the position to a white man; he believed himself to be the most qualified and best applicant; Louis LeBlanc remarked that

"no niggers would run the school", (*id.*, pp. 38-45; Doc. 804-12, pp. 2-8); blacks were given the dirtiest, most strenuous and most dangerous jobs; blacks were never named foreman; blacks were the first to be laid off; blacks were given jobs of shorter duration, (Doc. 804-11, pp. 3-4, 9-11, 12-16, 20-23, 26-35); he has experienced racial slurs and harassment but he did not report it with the exception of one occasion, and he was laid off, (Doc. 804-12, pp. 16-19); and no blacks were ever invited to attend a labor conference or encouraged to be on the executive board, (Doc. 804-11, p. 8; Doc. 804-12, pp. 21-23).

In order to defeat summary judgment as to his hostile work environment claim, Freeman must present evidence that a genuine issue exists to be tried as to the elements of that claim. The record evidence, summarized above, does not exhibit an environment permeated by discriminatory intimidation, ridicule and insult that was severe and pervasive and altered the conditions of Freeman's employment and created an abusive working environment. While the record evidence reflects instances of unfair treatment allegedly based on race, the timeline of Freeman's events does not reflect frequency of discriminatory conduct, severity, physical threat or humiliation, and interference with Freeman's work performance. *Stewart*, 586 F.3d at 328; *Ramsey*, 286 F.3d at 268. As Defendant argues, no reasonable fact finder could find that Plaintiffs' established that there was intentional, pervasive, and regular racial discrimination of which Local 198's supervisors and management were aware and which Local 198 permitted to continue. (Doc. 737-2, p. 15, citing *Celestine*, 266 F.3d at 354).

On the other hand, Plaintiffs offered evidence in support of a *prima facie* case of disparate treatment based on racial discrimination - that Freeman was a member of a protected class, that he was treated differently than white men for jobs for which Freeman was qualified, and that he suffered adverse employment actions due to his race. *McCormick*, at *2; *Hill*, 918 F.2d at 1238;

*Vaughn,* 918 F.2d at 521.  While Defendant offered affidavit testimony to dispute the disparate treatment of all Plaintiffs based on race, (Doc. 737-4), the record evidence sufficiently supports that a genuine issue of material fact remains for trial on Freeman's disparate treatment claim.

Further, Freeman testified that black men did not receive the same training as white men, resulting in fewer opportunities and the dirtier jobs.  He testified to instances where he was treated differently than white men in the workplace.  However, his testimony, and the record evidence before the Court with regard to Freeman's claims, sounds more in the nature of a disparate treatment claim, and not a disparate impact claim.  No party argued what the facially neutral policy relevant to Freeman's complaints might be.  For these reasons, Freeman's disparate impact claim is dismissed with prejudice.

Based on the applicable law, facts, and record evidence as set forth above, the Court finds that there is no genuine issue of material fact regarding Freeman's hostile work environment claim and disparate impact claim, and these claims are <u>dismissed with prejudice</u>.  The Court finds that there are genuine issues of material fact regarding Freeman's disparate treatment claim; therefore, Defendant's motion is <u>denied</u> as to this claim.

### Kevin Gauthier

Kevin Gauthier is named as a Plaintiff in the original complaint.  (Doc. 1).  Gauthier was the subject of Defendant's prior motion on the timeliness of Plaintiffs' claims.  As a result of that prior ruling, only Gauthier's claims under state law and Section 1981 remain pending.  (Doc. 700).

Gauthier testified to the following: that black men, including himself, were not given the same training as white men, including specialized training that led to better jobs, (Doc. 804-15, p. 15); that the classes were administered such that only white men were given the best classes and the classes that were in demand so that the black men could not enroll, (*id.*, p. 22); that he was

given the nastiest, dirtiest work, (*id.*, pp. 15-17); the system was designed such that only white men were trained in the better skills so that they were assigned the better jobs, and black men, who were not trained by Local 198, were not assigned or "qualified for" the better jobs, (*id.*, p. 23); that black men, including himself, were asked to do the work tasks that no one else wanted to do, and if he refused, he was reported, (*id.*, pp. 11-12); he obtained all out of state work on his own without any assistance from Local 198, (*id.*, pp. 28-30); his business manager, Sammy Graphia, would not help him, told him that there was no work, and then gave jobs to the white men, (*id.*); while at the hall, he was the subject of comments that the union would "let anyone in now" and "where is that nigger from", which caused him to want to stay home and seek out jobs out of state in better working environments, (*id.*, pp. 13-14, 18-19, 21); and he heard LeBlanc say that the "nigger gets under my skin", (*id.*, pp. 25-27).

Plaintiffs offered additional testimony of Gauthier which also evidenced that he was called "nigger rat" and that he was not given a recall job in 20 years with Local 198. (Plaintiffs cite to Doc. 827-5; however, this document has no deposition cover or identification of the deponent providing the testimony. While Plaintiffs represent that Gauthier testified at "Ex. 5", it is unclear whose testimony is actually in the record.). Plaintiffs relay pages and pages of detailed testimony by Gauthier of specific instances of how the job assignment procedures in place were maladministered to benefit white workers and disadvantage black workers, including himself. For example, he witnessed his name on the top of a work list with "400 names" beneath his own; the names beneath him always worked, and he did not. (Doc. 827, pp. 10-12).

In order to defeat summary judgment as to his hostile work environment claim, Gauthier must present evidence that a genuine issue exists to be tried as to the elements of that claim. The record evidence, summarized above, does not reflect that a reasonable jury may find an

environment permeated by discriminatory intimidation, ridicule and insult that was severe and pervasive and altered the conditions of Gauthier's employment and created an abusive working environment. Under the law, complaints of racial epithets and slurs does not rise to the level to create a "hostile work environment". *See* the Court's analysis of Adams' hostile work environment claim.

Plaintiffs offered evidence in support of a *prima facie* case of disparate treatment based on racial discrimination - that Gauthier was a member of a protected class, that he was treated differently than white men for jobs for which Gauthier was qualified, and that he suffered adverse employment actions due to his race. *McCormick*, at *2; *Hill*, 918 F.2d at 1238; *Vaughn,* 918 F.2d at 521. While Defendant offered affidavit testimony to dispute the disparate treatment of all Plaintiffs based on race, (Doc. 737-4), the record evidence sufficiently supports that a genuine issue of material fact remains for trial on Gauthier's disparate treatment claim.

Further, Plaintiffs explained how the recall and call-back procedures were designed to work, facially neutral policies where the contractor was in charge of who was recalled, etc. However, Gauthier testified at length and in great detail about how the job assignment policies were actually administered, resulting in black workers not receiving necessary training, thereby disqualifying them for jobs, and black men waiting on job assignments that never came to be while white men, whose names were below them on the list, were always working. Thus, Local 198 controlled which workers were called for jobs, resulting in white men obtaining the jobs. (Doc. 770, pp. 2-10, 25, 30, 32-33). *Pacheco*, 448 F.3d at 791-92. Again, Defendant offered conflicting testimony detailing that the procedure was neutral on its face and applied in accordance with the collective bargaining agreements in place. (Doc. 737-4). Defendant does not deny that contractors may be discriminatory in their list of names for jobs, but Defendant argues that that Local 198 does

not control its contractors and the contractors must answer for their own actions. This evidence creates an issue of fact for trial regarding Gauthier's disparate impact claim. *See* the Court's analysis of Catherine's disparate treatment and disparate impact claims.

Based on the applicable law, facts, and record evidence as set forth above, the Court finds that there is no genuine issue of material fact regarding Gauthier's hostile work environment, and this claim is <u>dismissed with prejudice</u>. There is a genuine issue as to Gauthier's disparate treatment and disparate impact claims; therefore, Defendant's motion is <u>denied</u> as to these claims.

### Larry Gilmore

Larry Gilmore was the subject of Defendant's prior motion regarding timeliness. Only Gilmore's claims under Section 1981 remain pending. (Doc. 700).

Gilmore testified as follows: that he secured welding job assignments, but when he reported to the job, he was demoted to "dirtier" work of pipe fitting tasks while the white workers did welding work in the fab shops, (Doc. 737-19, pp. 14-15, 21-22); the foremen are all white members of Local 198, not employees of the contractor, and the foremen, members of Local 198, made the job assignments, (*id.*, pp. 16, 23); he observed racially-charged jokes in the workplace, graffiti in the restrooms, and frequent use of the word "nigger", (*id.*, pp. 24-28); Local 198 sent white men on jobs "under the table", not in accordance with the procedure, and, as a result, Gilmore has only been recalled two times, (*id.*, pp. 11-14); when Gilmore would report to a work site, white workers were already there, (*id.*); and Gilmore learned that jobs were being assigned to white workers and they were never posted on the board, (*id.*).

Plaintiffs also offer the Declaration of Gilmore that is consistent with his deposition testimony and directly responds to the Affidavit of LeBlanc. (Doc. 784-2).

Applying the same analysis as is set forth above, Gilmore has shown that a genuine issue for trial exists as to his claims under Section 1981.  Gilmore "concedes" that he does not have a viable hostile work environment claim, (Doc. 781, p. 2); therefore, Gilmore's hostile work environment claim is <u>dismissed with prejudice</u>.  The record evidence supports that a reasonable jury might find that he was subjected to disparate treatment and disparate impact due to his race. Based on the foregoing, Defendant's motion as to these claims is <u>denied</u>.  *See also* the Court's analysis of Catherine's disparate treatment and disparate impact claims.

### Rayfield Goings

Rayfield Goings filed suit because he has never been named foreman, made a supervisor, or received a welder job.  Only "the whites get those type of jobs".  (Doc. 737-20, p. 13). Defendant acknowledges in its motion that Goings testified that Local 198 controlled the appointment of foremen and supervisors, not the contractors, but Defendant did not cite to the testimony in the record.  (Doc. 737-2, p. 36).

Regarding a hostile work environment, Defendant highlights three instances of the use of racial epithets: a supervisor in 1981 told Goings that he would "run his black ass off"; a member in 1997 referred to him as a "nigger", for which Goings complained to his foreman; and at the union hall in 1997, he overheard LeBlanc say, "A nigger won't run this Local".  (*Id.*, p. 36, citing 739-20, pp. 14-28).

Plaintiffs offer the Declaration of Rayfield Goings.  (Doc. 784-1).  The declaration states, in summary: that Goings was a member from 1977 until around 2005, (*id.*, p. 1); white workers received recalls, and black members did not, (*id.*, p. 2); the recall lists were administered in order to "keep the African Americans out", (*id.*); there were no job postings for recalls, (*id.*, p. 3); LeBlanc assigned his friends to recalls that were never posted on the board, (*id.*); the rules for

recall did not apply equally to whites and blacks – blacks were required to work for contractors at least six months before being recalled, but whites worked continuously and did not have these requirements, (*id.*); recalls were not posted on the board, and jobs were saved for whites and friends of leadership, (*id.*, p. 4); the word "nigger" was used at the hall, LeBlanc was in the KKK, and graffiti was on the walls in the bathrooms, (*id.*); supervisors were appointed by Local 198, and the supervisors would then tell the business manager who to call for jobs, (*id.*, p. 5); whites got better jobs, earned more money, and "lasted longer", (*id.*, p. 7); and whites were allowed to retire and earned more money in retirement, while blacks were laid off before they retired and earned less money, (*id.*, p. 8).

Plaintiffs also offer Goings' Supplemental Intake Questionnaire. (Doc. 784-1, pp. 10-17). The questionnaire repeats many of the complaints to which Goings testified by deposition and declaration. Goings also filed a charge with the EEOC after suit was filed related to racial discrimination in the recall procedure. (*Id.*, pp. 18-20).

Applying the same analysis and legal authority as set forth above, Goings has not shown that a genuine issue for trial exists as to his hostile work environment claim. Goings testified to disparate treatment between whites and blacks in job assignments and work management and disparate impact of the implementation of a facially neutral recall and call-back policy. *See* the Court's analysis of Adams' claims. The record evidence supports that a reasonable jury might find that he was subjected to disparate treatment and disparate impact due to his race. Based on the foregoing, Goings' hostile work environment claim is <u>dismissed with prejudice</u>, and Defendant's motion as to Goings' disparate treatment and disparate impact claims is <u>denied</u>.

**John Green**

John Green is a named Plaintiff in the original complaint. (Doc. 1). His claims were the subject of Defendant's prior motion on timeliness, and only his claims under Section 1981 and Title VII remain pending as a result of that ruling. (Doc. 700).

Green testified as follows: he was never made a supervisor or steward, no blacks were, and he complained about this to Local 198, (Doc. 804-16, pp. 16-18); because he was black, he was made to carry heavy equipment for others, (*id.*, pp. 42-45); whites were promoted over blacks regardless of experience or training, (*id.*, p. 27); Local 198 voted in a recall policy that discriminated against blacks and "hurt everybody", (*id.*, pp. 19-24); only white men were recalled, and call-outs were only made when white friends were present to get the job, (*id.*, pp. 28-29); he was forced to take jobs out of town when there was available work in town, (*id.*, pp. 31-32); LeBlanc said, "You'll be a rich nigger when you get back.", (*id.*, p. 32); and whites were given training that led to better jobs that were not given to blacks, like plumbing, (*id.*, pp. 11, 35-41).

The focus of Green's testimony and complaints is discrimination in the recall and call-out procedures as well as in promotions to foreman or supervisor. His testimony is replete with explanation of how the procedures were not followed in order to favor white workers over black workers. (Doc. 827, pp. 13-14).

Applying the analysis set forth above, Green has not shown that a genuine issue for trial exists as to his hostile work environment claim. Green has shown that a genuine issue for trial exists as to his disparate impact and disparate treatment claims. The record evidence supports that a reasonable jury might find that he was subjected to disparate treatment and disparate impact due to his race. *See* the Court's analysis of Adams' claims. Based on the foregoing, Green's hostile work environment claims under Section 1981 and Title VII are underlined(dismissed with prejudice).

Defendant's motion as to Green's disparate treatment and disparate impact claims under Section 1981 and Title VII is <u>denied</u>.

### Alfreddie Greensberry

Alfreddie Greensberry testified to the following:  that blacks are laid off first and given assignments last, (Doc. 737-21, pp. 4, 19-20); the foreman, who is a member of Local 198, chooses who is recalled and assigned, and he chooses whites over blacks, (*id.*, 20-22); he had experiences where no one wanted to work with him and the white foreman would give work to the white apprentice instead of him, *(id*., pp. 22-23); over the years, he was called names like "nigger" and "spear chunker", (*id*., pp. 13-14); racial slurs were written in the Port-O-Let on job sites, (*id*., p. 17); LeBlanc lied to him about job availability, (*id*., p. 3); and training classes occurred to which he was not invited or about which he was not informed, (*id*., pp. 5, 10-11).

In opposition, Greensberry explained that LeBlanc lied about work in at least one instance where LeBlanc told him that there was no work on a job on the Alaska pipeline.  However, over 20 white members disclosed that they worked on the job.  (Doc. 781-1).  A second incident occurred when a Local 198 leader told him there was no work on the road.  However, Greensberry obtained a job in Missouri on his own, and when he arrived, there were six Local 198 members already working.  (Doc. 781-1).  Defendant contends that Greensberry's testimony is incorrect and his claims are untimely.  Defendant argues that LeBlanc and Zumo were not serving as business managers at the times that this occurred; therefore, Greensberry is incorrect in his testimony and, at a minimum, untimely in advancing his claims.  (Doc. 789, p. 2).

Greensberry concedes that he does not have a viable hostile work environment claim, (Doc. 781, p. 2), and this claim is <u>dismissed with prejudice</u>.  Applying the analysis set forth above, Greensberry has shown that a genuine issue for trial exists as to his disparate impact and disparate

treatment claims.  The record evidence supports that a reasonable jury might find that he was subjected to disparate treatment and disparate impact due to his race.  Based on the foregoing, Defendant's motion as to Greensberry's disparate treatment and disparate impact claims is <u>denied</u>. *See* the Court's analysis of Adams' disparate treatment and disparate impact claims.

### Mannie Henderson

Mannie Henderson filed an EEOC charge on August 15, 2001 and received a right to sue letter dated August 17, 2001.  (Doc. 804-17).  Henderson complained that he was continuously subjected to unequal terms and conditions of employment with regard to "call-outs" and "call-backs" because of his race.  Blacks "as a class" are discriminated against on a continuous basis. (*Id*., p. 1).

Henderson testified as follows: jobs were posted on the board, but when Henderson appeared for the job, Graphia and LeBlanc denied him the job because he was black, (Doc. 804-18, p. 3); when he was on a job as an apprentice, he was laid off and a white apprentice was brought in, (*id*., pp. 11-12); he feels that he was "denied an opportunity to work … because of the color of my skin.  And I felt like that then.  I feel like that to this day," (*id*., p. 13); he was overlooked for jobs as a foreman because he was black, (*id*., p. 43); he was harassed by "198 members on different jobs", (*id*., p. 21); harassment on 60% of the jobs by 198 members was brought up "before to the head of 198" and it was said that "if we are a union, we need to act like it instead of being parted", (*id.*, pp. 21-22); white members did not consider black guys members, (*id*., p. 22); the term "nigger" was used freely, (*id*., pp. 28-29); although he once complained about the use of the word "nigger", it was never brought up around Henderson again, (*id*., pp. 30-31); when he walked through plant sites, there were "hangman rope" on site, (*id*., p. 32); racial slurs as graffiti on bathroom walls, racial jokes, and "ropes" were on 90 percent of the jobs that Local 198 sent them

to, (*id*.); there was a black doll hanging in a noose at one of the plants, (*id*., p. 34); noose incidents have happened "several times" over the course of years, (*id*., pp. 38-39); he resigned himself to the facts that racial slurs would always be on bathroom walls and returned every time the walls were painted, (*id*., p. 42); LeBlanc used the term "nigger" loosely, and LeBlanc told Henderson that he was "not like the rest of the niggers", (*id*., pp. 22-23); on another occasion, LeBlanc said to "leave it to the niggers, they'll f**k it up", (*id*., p. 24); jobs are not always assigned according to the list because some "guys get called at their house", (*id*., p. 4); he had made it known that he was interested in out of state work and was an active member in good standing, but Local 198 sent white retirees to the out of state jobs instead of Henderson, (*id*., pp. 7-10, 17); that Graphia told him that he would always choose the white worker over him even if he was "five minutes from the town", and Henderson testified in detail about various instances in which procedures were not followed resulting in him not getting work, (*id.*, pp. 14-20); and black delegates were nominated to go to conventions but were then denied the opportunity, (*id*., p. 6).

Plaintiffs opposed Defendant's motion offering additional testimony from Mannie Henderson that conveyed the same message as the excerpts summarized above. (Doc. 831).

Defendant argues in reply that Henderson's claims are untimely and that his allegations fail to state a claim. (Doc. 833, p. 11). However, Defendant bases this conclusion on cherry-picked dates taken out of context and a simplified summary of Henderson's testimony. Henderson testified to more years and time periods than are accounted for in Defendant's motion, and he testified repeatedly that the behavior and faulty procedures occurred consistently over the years. Further, much of Henderson's testimony explained in great detail what the proper procedure in place was contrasted with a detailed explanation of what actually occurred.

Applying the law and analysis as set forth above, Henderson has shown a genuine issue of material fact regarding his claims of hostile work environment, disparate treatment, and disparate impact. Defendant's motion is <u>denied</u> as to Henderson's claims. *See* the Court's analysis of Bell's claims.

**Clyde Holliday**

Clyde Holliday was the subject of Defendant's prior motion regarding timeliness, and only his claims under state law and Section 1981 remain pending. (Doc. 700). Holliday testified to the following: the call-back lists were not followed when job assignments were made, and he was never placed in a supervisory or foreman role, (Doc. 804-19, pp. 21-25); that J.C. Hicks caused "quite a few problems" when he "became business manager", and he told Henderson that he needed "to forget about all that black stuff", (*id.*, p. 12); this hall had "much nepotism", it was family-oriented and one family was against the other family, (*id.*, pp. 15-16); white family members received preference on job assignments, (*id.*, 14-16); Local 198 prevented him from working out of the country when that was the only work available, (*id.*, p. 6); his business manager from Local 198 told him that there was no work in New Jersey, but when Holliday went there himself, there were jobs and he worked, (*id.*, p. 7); there was racial graffiti inside Port-O-Lets continuously, and when it was painted, members continued to write more graffiti, (*id.*, pp. 19-20); and he was not allowed to participate in a picket line based on his race, (*id.*, pp. 8-11).

Plaintiffs offered the Declaration of Clyde Holliday in opposition to Defendant's motion. (Doc. 842-4). He declared the following: he experienced racial discrimination with respect to job referrals; he heard a call come in for 20 fitters for a job, but when he and his friends arrived at the hall, there were no jobs available; all the fitters assigned were white; he heard Zumo say, "All I got is some black fitters and they ain't no good."; Zumo told him there was no work in New Jersey

86

when the New Jersey business administrator had already told Holliday that there was work; he was told that there was no work, but when he arrived at a job site, he saw Local 198 white workers; and black workers were told that there was no work, and then Local 198 would send white workers to the job.  (*Id*.).

In reply, Defendant argued that it did not understand Holliday's argument.  (Doc. 844, p. 4).

Applying the analysis set forth above, Holliday has not shown that a genuine issue for trial exists as to his hostile work environment claim.  *See* the Court's analysis of Adams' hostile work environment claim.  Holliday has shown that a genuine issue for trial exists as to his disparate impact and disparate treatment claims.  The record evidence supports that a reasonable jury might find that he was subjected to disparate treatment and disparate impact due to his race.  *See* the Court's analysis of Catherine's disparate treatment and disparate impact claims.  Based on the foregoing, Holliday's hostile work environment claims are dismissed with prejudice.  Defendant's motion as to Holliday's disparate treatment and disparate impact claims is denied.

## Freddie Jackson

Freddie Jackson testified that a teacher once told him that 75 percent of his craft is learned in the field, not in the class.  However, only white apprentices or students were given opportunities to work in the fab shop (field experience), not the black apprentices.  Black workers were given the hardest and least desirable jobs which did not support the black workers in learning their craft.  (Doc. 737-22, pp. 6-8).  Also, when he was an apprentice, a man named George Washington called him "nigger" approximately two to three times, but when Jackson stood up to him, he apologized, and it never happened again.  (*Id*., pp. 3-5).

Jackson further testified that he attempted to "pick up a job" off the board, but a business agent tried to talk him out of it.  When he reported to the job, the contractor told him that he told Local 198 not to send "me any niggers".  Jackson testified that Local 198 should not tolerate the discrimination "from contractors".  (Doc. 770-21, pp. 4-6).

The record evidence and this plaintiff's arguments on summary judgment are woefully inadequate to support the remaining claims of Freddie Jackson.  There is no evidence supporting Jackson's claims and showing that he can meet his burden.  There is no evidence of a genuine issue of fact suitable for trial with regard to Jackson's claims.  *Matsushita Elec. Indus. Co*., 475 U.S. at 587; *Int'l Shortstop, Inc*., 939 F.2d at 1263.  Based on the applicable law, facts, and record evidence as set forth above, the Court grants Defendant's motion with regard to Freddie Jackson's claims.  Jackson's claims are <u>dismissed with prejudice</u>.

### Michael Jackson

Michael Jackson was named in the original complaint filed on May 1, 1998.  (Doc. 1). Jackson was the subject of Defendant's prior motion on timeliness, and only his claims under state law and Section 1981 remain pending as a result of that ruling.  (Doc. 700).

Jackson testified to the following: he remembers blacks being assigned to the "dirtiest" and "nastiest" jobs, (Doc. 804-20, pp. 29-32); he has never been recalled, (*id.*, p. 6); the foremen are usually white, (*id.*); the foremen call the guys for the job, and because they are white, they call white guys, (*id.*); blacks were required to know two types of welding, and whites were required to know one, (*id.*, pp. 14-15); white members "constantly" use the word "nigger" around the hall, (*id.*, pp. 7-8); a foreman called him "nigger" and told him that he was going to fire Jackson, and he and Jackson "started fighting", (*id.*, pp. 21-22); he has never received a recall, and LeBlanc

88

controls who gets the recalls, (*id*., pp. 27-28); and LeBlanc "refused" to tell him about work in Ohio when Jackson was looking for work, (*id*., p. 10).

Plaintiffs also point to the following testimony of Jackson: LeBlanc told whites not to tell Jackson about out of town work, (Doc. 827-8, p. 2); and black members were never allowed to represent Local 198 at the convention, (*id*., p. 14).

The record evidence and arguments on summary judgment are woefully inadequate to support the remaining claims of Michael Jackson. There is no evidence supporting Jackson's claims and no showing that he can meet his burden. There is no evidence of a genuine issue of fact suitable for trial with regard to Jackson's claims. *See* the Court's analysis of Freddie Jackson's claims. Based on the applicable law, facts, and record evidence as set forth above, the Court grants Defendant's motion with regard to Michael Jackson's claims. Jackson's claims are <u>dismissed with prejudice</u>.

### Jonas Jacob

Jonas Jacob was named in the original complaint filed on May 1, 1998. (Doc. 1). Jacob was the subject of Defendant's prior motion on timeliness, and only his claims under state law and Section 1981 remain pending as a result of that ruling. (Doc. 700).

Jacob testified as follows: he got the worst work, (Doc. 804-21, p. 16); the foremen were members and assigned the work, (*id*.); blacks were first on the list but did not get a recall, (*id*., p. 25); blacks are the first ones laid off, (*id*., p. 26); he would be laid off and then when he visited the hall, the job was on the board, (*id*., pp. 41-43); he has never been asked to be a foreman or supervisor, (*id*., pp. 28-29); the jobs on the boards would ask for a certain number of workers, but when he got to the job, he saw a greater number and the overage were all white workers, (*id*., p. 11); he has never been recalled, (*id*., p. 35); he was referred to as a "nigger" a couple of times,

once because he bought a new car and was called "rich nigger", (*id.*, pp. 19-20, 32-33); and he finds disparity in the lack of blacks in leadership positions and being invited to the conventions, (*id.*, p. 35).

In the evidence submitted by the parties regarding Jacob's testimony, all of the testimony was vague, hard to follow, and related to blacks in general, especially with regard to the job assignment issue. He testified to "blacks" being treated differently but did not testify to his claim sufficiently. (Doc. 804-1; Doc. 842; Doc. 844). Applying the law and analysis as set forth above, Jacob has not sufficiently shown a genuine issue of material fact regarding his claims of hostile work environment, disparate treatment, and disparate impact under state law and Section 1981. *See* the Court's analysis of Catherine's and Freddie Jackson's claims. Jacob's claims are <u>dismissed with prejudice</u>.

### Earnest Johnson

Defendant seeks to dismiss all of Earnest Johnson's pending claims. (Doc. 804). Earnest Johnson states that he withdraws his opposition to Defendant's motion. (Doc. 842). Johnson confirms his withdrawal of his opposition in the joint chart filed on May 14, 2020. (Doc. 843, p. 1). All claims by Earnest Johnson are <u>dismissed with prejudice</u>.

### Carl Judson

Carl Judson was the subject of Defendant's prior motion on timeliness, and only his claims under state law and Section 1981 remain pending as a result of that ruling. (Doc. 700).

When he applied to the apprenticeship program, Judson was denied admission a few times. When he was finally admitted, there were more whites than blacks. He felt like they only admitted enough blacks to make it look like they were not discriminating. (Doc. 737-23, p. 17). Judson also testified: that blacks were always the first to be laid off, (*id.*, p. 5); blacks got the "crap jobs",

and relatives of Local 198 leadership got the best jobs, (*id*., pp. 19-20); drug testing is supposed to be randomly selected by a computer, but he was drug tested three times in one week, (*id*., p. 23); he has heard racial slurs but never directly to him, (*id*., p. 11); he saw racial slurs written on the walls in the bathroom, (*id*., p. 12); and he has never had a recall, (*id*., p. 15).

Plaintiffs offer the Declaration of Carl Judson. (Doc. 795-1). Judson declared: he was a member from 1982 through "the present day", but Local 198 stopped assigning him jobs in 1991, (*id*., p. 1); he has paid dues "to date", but he has not received any assignments, (*id*., p. 2); Local 198 saved certain jobs for certain members, (*id*.); white workers got recalls and black workers did not, (*id*., pp. 2-3); Local 198 waited for their white friends to arrive to post jobs or they called their white friends to assign jobs, (*id*., p. 3); recall lists were formed to keep African Americans out, (*id*.); he would arrive at a job and white workers would already be there, (*id*.); African Americans only got recalls if they worked for an employer for at least six months, but whites did not have to do that, (*id.*, pp. 3-4); recalls were not put on the board at all or they waited to put them on the board after everyone had left, (*id*., p. 4); Local 198 would select white foremen who would be sent to the job first, and the foreman would then select who got call-backs, all white men, (*id*., p. 5); and whites had the advantage and there was nothing the blacks could do about it, (*id*., pp. 6-7).

Judson concedes he has no claim of a hostile work environment, (Doc. 781, p. 2); therefore, his hostile work environment claims are <u>dismissed with prejudice</u>. Applying the analysis set forth above, Judson has shown that a genuine issue for trial exists as to his disparate impact and disparate treatment claims. The record evidence supports that a reasonable jury might find that he was subjected to disparate treatment and disparate impact due to his race. *See* the Court's analysis of Catherine's claims. Based on the foregoing, Defendant's motion as to Judson's disparate treatment and disparate impact claims is <u>denied</u>.

**Freddie Judson, Jr.**

Defendant seeks to dismiss all of Freddie Judson, Jr.'s pending claims. (Doc. 804). Freddie Judson, Jr. states that he withdraws his opposition to Defendant's motion. (Doc. 842). Judson confirms his withdrawal of his opposition in the joint chart filed on May 14, 2020. (Doc. 843, p. 2). All claims by Freddie Judson, Jr. are <u>dismissed with prejudice</u>.

**Kenneth Judson**

Kenneth Judson testified as follows: that blacks were assigned the dirtiest, most strenuous jobs, and the white workers were assigned to the better fabricating jobs, (Doc. 737-24, pp. 6-12); when opportunities to work a fabricating job came along, Judson "let it go" because he "wasn't sure of [his] skills", (*id*., p. 20); he did not have the confidence in himself to do the job and he feared being fired because he did not perform the job well due to lack of confidence, (*id*., p. 21); racial slurs written on the bathroom walls was on "any job you go on", (*id*., p. 22); because racial epithets were everywhere, he took "it in stride" and chalked it up to "people just ignorant", (*id*.); the recall and call-out procedure was not handled according to proper procedure, and it is a "form of discrimination", (*id*., pp. 3-5, 13); the same people were recalled "again and again", (*id*., p. 18);[20] Judson's primary complaint is about the recall system, but he did not know he had the right to complain about back pay and other issues as well, (*id*., pp. 24-27); and Judson has taken out of town jobs because these jobs allow him to fabricate and work, (*id*., pp. 13-14).

Plaintiffs offered the Declaration of Kenneth Judson. (Doc. 770-14). Judson declared as follows:  he was a member of Local 198 from 1982 until around 2010, (*id*., p. 1); the procedure for assigning jobs was not followed, (*id*., p. 2); certain jobs were for certain members, (*id*.); white

---

[20] Defendant only introduced one page of this testimony from Judson's deposition.  The one page reflects that Judson testified that the same people were recalled again and again; however, it is evident that there was more to this testimony explaining who those people were.  Defendant does not include the full testimony.  (Doc. 737-2, p. 40; Doc. 737-24).

workers got recalls, and the black workers did not, (*id.*); Local 198 leadership would wait until their white friends showed up in the Hall to post a job or they called their white friends to come in and pick up their work order, (*id.*); LeBlanc and Graphia would pick people to send to work, and they would not post jobs, but Judson would see the workers on the job when he got there, (*id.*, pp. 2-3); recalls were not put on the board until after the work orders already went out, (*id.*, p. 3); black people were the first to be laid off, and they were rarely named foreman or supervisor, (*id.*, p. 4); Judson filed suit due to the call-back and call-out procedure and the inferior job assignments, (*id.*, p. 5); and he should not have had to go out of town to get work, (*id.*).

The Court notes that Kenneth Judson crossed out or "lined through" the second paragraph on page five of his declaration regarding a hostile work environment, and he initialed his edits. (*Id.*, p. 5). Although Plaintiffs quote this same language in their opposition as if Kenneth Judson testified to same, it appears that Kenneth Judson does not agree with this declaration. (Doc. 770, p. 45).

Applying the analysis set forth above, Judson has not shown that a genuine issue for trial exists as to his hostile work environment claim. Judson has shown that a genuine issue for trial exists as to his disparate impact and disparate treatment claims. The record evidence supports that a reasonable jury might find that he was subjected to disparate treatment and disparate impact due to his race. *See* the Court's analysis of Adams' claims. Based on the foregoing, Judson's hostile work environment claims are dismissed with prejudice. Defendant's motion as to Judson's disparate treatment and disparate impact claims is denied.

93

## Michael Kyles[21]

Michael Kyles is a named Plaintiff in the original complaint filed on May 1, 1998.  (Doc. 1).  Kyles filed a charge with the EEOC, dated August 15, 2001, complaining of violations from January 1, 1998 through May 24, 2001.  (Doc. 804-25).  The charge describes the "circumstances of the alleged violation" as Kyles has been "continuously subjected to unequal terms and conditions of employment with regard to 'call-outs' and 'call-backs' because of his race, Black, and that Blacks, as a class, are similarly discriminated against on a continuous basis".  (*Id.*).

Defendant argues that Kyles testified that he should have been named foreman and supervisor but never was and that he was falsely accused of excessive absenteeism.  (Doc. 804-1, p. 32, citing Doc. 804-24).  However, the excerpts of the deposition to which Defendant cites are either not in the record or do not reflect the testimony for which it is cited.  Kyles testified as follows: he filed this lawsuit because he thinks that he has "been discriminated against", (Doc. 804-24, p. 29); he was laid off from jobs because he was black, (*id.*); the recall and job assignment system discriminated against him because he was black, (*id.*, p. 30); he "ended up with jobs making less money", (*id.*); in the past, foremen were "rude, obnoxious, and made racial slurs", (*id.*, p. 32); he has only been recalled one time, (*id.*, p. 10); Local 198 only calls "who they want", (*id.*); he was discriminated against in out of town job assignments because he was assigned to the out of town jobs that paid less, (*id.*, pp. 23-24); and white journeymen were compensated, but blacks were not, (*id.*, p. 27).

Defendant cited to Kyles' deposition testimony, arguing that Kyles testified to the recall system and how it was controlled.  (Doc. 804-1, p. 32, citing Doc. 804-24, pp. 22, 26-27, 42-45).

---

[21] On May 22, 2020, Plaintiffs moved the Court to substitute Michael W. Kyles, Jr. as proper party Plaintiff for Michael W. Kyles, Sr.   Michael Kyles, Sr. passed away on January 1, 2020.  (Doc. 845).  The Court ordered the substitution of parties on May 28, 2020.  (Doc. 846).  Michael W. Kyles, Jr. is now bringing the claims of his father on his behalf.

However, the excerpts attached did not offer testimony in this regard. Because the testimony was taken out of context, it was unclear.

Plaintiffs argue that Kyles "explained that the foremen … are doing the recalls of their friends" and "recalled the first 40-50 members", (Doc. 827, p. 16, citing Doc. 827-13); however, Exhibit 13 is the deposition of Lionel Richard, not Kyles. Plaintiffs did offer additional testimony of Kyles that he was discriminated against because he was not assigned jobs for anything other than unloading pipe trucks, and Local 198 told him that is why he was hired. (Doc. 827-9, p. 18).

Defendant argues that Kyles' testimony is "all conjecture not evidence". (Doc. 833, p. 12). Defendant outlines Kyles' work history and concludes that his complaints are untimely. (*Id*.). Defendant maintains that any complaints about not being made foreman are baseless because the contractor selects foremen". (*Id*.). Defendant offered the testimony of Oliver Jones, business manager and secretary/treasurer of Local 1177, that "under the contract", the union "controlled referral" unless the contractor called for people by name. (*Id.*, p. 13). As long as the worker was paid up and had worked for four to six months, they were called for work. (*Id*.).

Based on the applicable law, facts, and record evidence as set forth above, the Court finds that there is no genuine issue of material fact regarding Kyles' hostile work environment claim and this claim is <u>dismissed with prejudice</u>. In addition, Plaintiffs offered insufficient evidence in support of Kyles' disparate treatment and disparate impact claims. Kyles simply did not offer sufficient evidence to support the elements of these claims or to create a genuine issue suitable for trial on these claims. *See* the Court's analysis of Freeman's and Freddie Jackson's claims. For these reasons, these claims are also <u>dismissed with prejudice</u>.

**Herbert Lavergne**

Herbert Lavergne is a named Plaintiff in the original complaint filed on May 1, 1998.  (Doc. 1).  Lavergne filed a charge with the EEOC, dated August 15, 2001, complaining of violations from January 1, 1998 through May 24, 2001.  (Doc. 804-26).  The charge describes the "circumstances of the alleged violation" as Lavergne has been "continuously subjected to unequal terms and conditions of employment with regard to 'call-outs' and 'call-backs' because of his race, Black, and that Blacks, as a class, are similarly discriminated against on a continuous basis".  (*Id.*).

Lavergne testified as follows: he worked in a hostile work environment because he was given the "dirty work", (Doc. 804-27, p. 7); the whites got asked to do the clean jobs first, (*id.*, p. 23); when Lavergne complained that the whites did not get the dirty jobs, he was told "no, there's some whites they don't like", (*id.*, p. 10); whites picked the jobs they wanted for overtime, (*id.*, p. 22); his foreman told him to eat with the pipefitters, but when he refused, he was laid off, (*id.*, p. 30); he has heard racial slurs over the years, (*id.*, pp. 8-9); he does not claims that he treated unfairly for discriminatory reasons by Local 198, (*id.*, p. 17); they tried to break him, but they couldn't and he was determined to stick with it, and the whites went through the same thing he did, (*id.*, pp. 26-28); bottles were thrown at his car in the past, (*id.*, p. 32); he has been recalled and his name has been called from the top of a list, (*id.*, p. 11); he never had problems obtaining out of state work through the hall, (*id.*, pp. 12-13); and Armstrong did not pick Lavergne to help unionize a job, and Lavergne felt this was discrimination, (*id.*, p. 20).

Lavergne's testimony related more to blacks in general and did not rise to the level to meet his burden on his claims.  He testified to "blacks" being treated differently, and instances of when he should have been treated better, but he did not testify to his claim specifically.  In fact, he testified that Local 198 did not discriminate against him based on race and he had no problem

securing the jobs he went after.  *See* the Court's analysis of Freddie Jackson's claims.  Applying the law and analysis as set forth above, Lavergne has not sufficiently shown a genuine issue of material fact regarding his claims of hostile work environment, disparate treatment, and disparate impact.  Lavergne's claims are <u>dismissed with prejudice</u>.

### Roberta McDomic

Roberta McDomic filed a charge with the EEOC, dated September 14, 2002, for alleged acts of discrimination that took place on March 5, 2002.  (Doc. 737-25, p. 2).  She claims that Local 198 failed to allow her to complete the program with no "adequate reason" provided, and she feels that this is a violation of Title VII based on race.  (*Id*.).  She was the only black in the program.  (*Id.*, p. 6).

McDomic filed an affidavit that is signed, notarized and dated March 17, 2016.  (Doc. 737-26).  The affidavit attests: LeBlanc called a contractor who had requested McDomic and told them to make her an apprentice, (*id*.); as a result, McDomic earned less money, (*id*.); a white member was put in the better job, (*id*.); LeBlanc called another contractor and told them that McDomic was on a different job when this was not true, (*id*.); she claims a hostile work environment because of "whispers" of this lawsuit, (*id.*, p. 2); and because she drove a new truck to work, Local 198 determined she did not need money and did not send her on jobs for six weeks, (*id*.).

McDomic also filed a declaration.  (Doc. 737-27).  The "supplement" on the second page is not signed or dated and will not be considered.  McDomic attests to the same substance set forth above with one addition.  She claims that she witnessed two white guys "riding the book" and getting continuous work for two to three years while others were not.  (*Id*.).

Defendant relies upon LeBlanc's testimony that Local 198 had no involvement in call backs and recalls.  (Doc. 737-2, p. 41).

A third declaration by McDomic was offered by Plaintiffs.  (Doc. 781-1, p. 2).  This declaration does not contain any new testimony.  Plaintiffs argue that because McDomic "was called by name she was qualified".  (Doc. 781, p. 9).

McDomic does not contest Defendant's motion regarding her claims of hostile work environment, (Doc. 781, p. 2); therefore, these claims are <u>dismissed with prejudice</u>.  Applying the law and analysis as set forth above, McDomic has not sufficiently shown a genuine issue of material fact regarding her claims of disparate treatment and disparate impact.  While McDomic attested several times to a few specific instances where blacks were treated differently than whites, she does not relate these instances with specificity in order to meet her burden on her claims.  The more substantive allegations specific to her are clearly regarding her time in school for training, not as an active member.  She also does not articulate the facially neutral policy that was administered in a discriminatory fashion in order to have a disparate impact upon her.  She does attest to general acts that could be construed by a jury as being discriminatory based on race; however, she does not sufficiently evidence how two white guys "riding the books", for example, related to her.  *See* the Court's analysis of Freddie Jackson's claims.  McDomic's claims are <u>dismissed with prejudice</u>.

### James Miles

James Miles was named as a Plaintiff in the original complaint.  (Doc. 1).  He filed a charge with the EEOC on March 5, 2001, regarding dates of "alleged violations" from January 1, 1998 to November 8, 2000.  (Doc. 804-28, p. 1).  He alleged that "on November 8, 2000 and during the last 300 days he has been denied recall because of his race, Black" and that "on a daily basis at least five journeymen or apprentices are recalled.  No Blacks have been recalled in the last 300 days."  (*Id*.).

A second charge filed with the EEOC on October 2, 2001, is offered in support of his claims. (Doc. 804-28, p. 3). This charge alleges a date of violations of August 26, 2001. He alleged that "Black members of Local 198 were not granted participation in the election of a union official for United Association organizer." (*Id*.).

Miles testified as follows: blacks are laid off because "they" don't want to work with blacks, (Doc. 804-29, p. 8); when he was laid off, he was replaced by white men, (*id*., pp. 12-13); Local 198 caused the layoffs because "all these boys" are from Ascension Parish, (*id*., p. 14); white workers were laid off too, (*id*., pp. 26-27); there were no black foremen or stewards because they were appointed by white family members and friends, (*id*., pp. 9-11, 30-31); black workers were given the most strenuous jobs, (*id*., p. 15); he has been called a "nigger" in the past, and he witnessed Local 198 leadership saying a "nigger would never be over the school", (*id*., p. 34); he has been denied a referral based on race, (*id*., p. 3); that there was an instance when all whites were hired on a recall, (*id*., p. 21); and LeBlanc called the foreman and told him who to call as members of 198, (*id*., p. 22).

Plaintiffs offer the Declaration of James Miles. (Doc. 827-11). Miles declared: he has been a member since 1994, (*id*., p. 1); members who were not on the board were given jobs, (*id*., p. 2); white workers got recalls and black workers did not, (*id.*); Local 198 leadership would wait for white friends to show up in the hall to post a job or call their white friends to come pick up a work order, (*id*.); he reported to jobs that had white workers on the job already and it had not been posted on the board, (*id*.); he was laid off first and white members went out before him, (*id*., p. 3); black workers had to work longer for contractors to get a recall than white workers, (*id*.); his name would be on the list longer and white workers got sent out first, (*id*.); LeBlanc set up the names for recall, not the contractor, (*id*.); LeBlanc used the word "nigger", (*id*., p. 4); Bob Anderson, the

"godfather", said, "Have you seen white sheep in the same pasture as black sheep", (*id.*); racial slurs were on the bathroom walls, (*id.*); LeBlanc did "not go by any bylaws or a book", (*id.*, p. 5); call outs and call backs were "racial", (*id.*); and Armstrong assigned only whites to jobs with "very good money", (*id.*, p. 6).

Applying the analysis set forth above, Miles has not shown that a genuine issue for trial exists as to his hostile work environment claim. Miles has shown that a genuine issue for trial exists as to his disparate impact and disparate treatment claims. Miles sufficiently identified specific programs that were neutral on their face and applied to him, specifically, in a discriminatory way. He sufficiently described instances of disparate treatment. The record evidence supports that a reasonable jury may find that he was subjected to disparate treatment and disparate impact due to his race. *See* the Court's analysis of Adams' claims. Based on the foregoing, Miles' hostile work environment claims are <u>dismissed with prejudice</u>. Defendant's motion as to Miles' disparate treatment and disparate impact claims is <u>denied</u>.

### Ivan Morgan

Defendant seeks to dismiss all of Ivan Morgan's pending claims; however, because Ivan Morgan previously represented to the Court that he did not oppose Defendant's motion, Ivan Morgan was dismissed with prejudice on December 18, 2019. (Doc. 757, p. 3).

### Sam Parker

Sam Parker was named as a Plaintiff in the original complaint. (Doc. 1). Parker was the subject of Defendant's prior motion, and only Parker's claims under state law and Section 1981 remain pending as a result of that ruling. (Doc. 700). He completed an Intake Questionnaire; however, he admitted in his deposition that his attorney's office answered those questions. (Doc. 737-29, pp. 5-6).

He testified as follows: he was assigned the hardest jobs by his foreman, (Doc. 737-29, p. 8); he was harassed in that everything he did had to be perfect or he would be laid off, (*id*.); the recall system was discriminatory because when he was out of work, people who had been working got a job, (*id*., p. 7); and names below his on the list were assigned to jobs before him, (*id*.).

Plaintiffs offered the Declaration of Sam Parker, which contains signatures, two of seven pages are notarized, and have two different dates. (Doc. 770-28). The declaration pages are out of order, and even when placed in current numerical order, they do not make sense. It is clear to the untrained eye that the declaration is a form declaration that was copied and pasted together in a very rudimentary fashion. Although Sam Parker's signature, or what purports to be Parker's signature, is at the bottom of each page, the declaration is suspicious. However, there is no evidence before the Court that the signature is not Parker's signature and that the declaration's contents are unreliable. Subject to this, Parker declared: white workers received recalls and black workers did not, (*id*., p. 2); leadership waited to post jobs for their white friends or they called their friends and told them to come pick up a work order, (*id*.); recall lists were formed to keep the African Americans out, (*id*.); LeBlanc and Graphia picked people to go on the jobs, (*id*.); he would report to jobs and see members working when it was never on the board, (*id*.); he would be laid off first and put on the board first, but workers behind him would be assigned work before him, (*id*.); black workers had to work for a contractor for six months before getting a recall, but white workers did not, (*id*.); he heard LeBlanc use the word "nigger" on multiple occasions, and LeBlanc told him that he did not believe in black and white kids going to school together, (*id*., p. 3); there was only one black foreman and one black supervisor in his time with Local 198, (*id*.); Local 198 chose the stewards, (*id*.); Local 198 members did not want black people in the trade, and they would send black workers to "fetch tools" during a critical part of training so that they would not

learn the trade, (*id.*, p. 5); the recall procedure was not followed, (*id.*); certain jobs were saved for certain members, (*id.*); Parker had a "very good skill level", but only whites were assigned permanent foreman positions, (*id.*, p. 7); and the board in the Hall "did not support" the call outs and call backs that LeBlanc was giving, (*id.*, p. 8).

Applying the analysis set forth above, Parker has not shown that a genuine issue for trial exists as to his hostile work environment claim. Although the evidence put forth by Plaintiffs in support of Parker's claims raises some questions, it is sufficient to upset summary judgment. Parker has shown that a genuine issue for trial exists as to his disparate impact and disparate treatment claims. Parker sufficiently identified specific programs that were neutral on their face and applied to him, specifically, in a discriminatory way. He sufficiently described instances of disparate treatment. The record evidence supports that a reasonable jury might find that he was subjected to disparate treatment and disparate impact due to his race. *See* the Court's analysis of Adams' claims. Based on the foregoing, Parker's hostile work environment claims are <u>dismissed with prejudice</u>. Defendant's motion as to Parker's disparate treatment and disparate impact claims is <u>denied</u>.

### Lionel Richard

Lionel Richard was a named Plaintiff in the original complaint. (Doc. 1). Richard was the subject of Defendant's prior motion on timeliness, and only his claims under state law and Section 1981 remain pending as a result of that ruling. (Doc. 700).

Richard testified as follows: he was up for foreman and certain other jobs and he did not get any of these jobs, (Doc. 804-30, p. 7); LeBlanc sends who he wants on the job "as foreman and steward", (*id.*, p. 8); the foremen treated him in a way that communicated that he did not want to work with Richard, (*id.*, p. 20); the foremen would show the white pipe fitters the plans, but they

would not show him, the only black worker, (*id.*, p. 21); he has only been recalled once, (*id.*, p. 14); he has heard people whispering racial jokes, (*id.*, p. 24); and LeBlanc determined who he wanted as foreman and steward, and "I don't think that he should be able to do that.", (Doc. 827-13, p. 9).

Defendant argues that Richard's complaints are "common" regarding whites getting jobs over those who are ahead of them on the list and getting better jobs than the blacks. (Doc. 844, p. 5). Defendant maintains its argument made throughout the briefing that "the practice is based on the contractual call-by-name provisions". (*Id.*). Because other black workers have been recalled, then Richard's argument is "not dispositive". (*Id.*).

Applying the law and analysis as set forth above, Richard has not sufficiently shown a genuine issue of material fact regarding his claims of hostile work environment, disparate treatment, and disparate impact. While Richard attested several times to a few instances where blacks were treated differently than whites, he does not relate these instances with specificity in order to meet his burden on his claims. He also does not articulate the facially neutral policy that was administered in a discriminatory fashion in order to have a disparate impact upon him. He simply testified that LeBlanc should not be able to "do that". He does attest to general acts that could be construed by a jury as being discriminatory based on race; however, he does not sufficiently evidence how these instances related to him. *See* the Court's analysis of Freeman's claims. Richard's claims of racial discrimination are <u>dismissed with prejudice</u>.

### Donald Robertson

Donald Robertson was a named Plaintiff in the original complaint. (Doc. 1). Robertson was the subject of Defendant's prior motion on timeliness, and only his claims under state law and Section 1981 remain pending as a result of that ruling. (Doc. 700).

Robertson testified as follows:  Turner Industries would lay off the black guys first, (Doc. 804-31, p. 13); he saw racial slurs on the bathroom walls at Dow, (*id*., p. 14); the person who laid him off was not a member of Local 198, (*id*.); work orders were distributed "one-on-one" and it should have been available to everyone in the Hall, (*id*., p. 6); there were racial slurs and jokes in the "portocans", (*id*., p. 9); the reference to a hangman's noose was "over the years" and not in "this jurisdiction", (*id*., pp. 9-10); and he has never seen a hangman's noose in his time in Local 198, (*id*., p. 10).  Additionally, he was not told about out of town jobs.  (Doc. 827-14, p. 2).

The record evidence and arguments on summary judgment are woefully inadequate to support the remaining claims of Donald Robertson.  There is no evidence supporting Robertson's claims and showing that he can meet his burden.  There is no evidence of a genuine issue of fact suitable for trial with regard to Robertson's claims.  *See* the Court's analysis of Freddie Jackson's claims.  Based on the applicable law, facts, and record evidence as set forth above, the Court grants Defendant's motion with regard to Donald Robertson's claims.  Robertson's claims are dismissed with prejudice.

### Willie Stone

Willie Stone testified as follows: he was given very strenuous jobs, (Doc. 737-31, p. 7); he has been referred to as "nigger" before, (*id*., p. 18); people wrote racial slurs on the walls, (*id*., p. 19); he saw a burning cross and a hanging noose, and he made a vague reference to David Duke and the KKK, (*id*., p. 20); and his name was forged to authorize taking a dollar out of his check for a political fund, (*id*., pp. 5-6).

Plaintiffs submitted the Declaration of Willie Stone.  (Doc. 770-11).  Stone declared:  he was a member of Local 198 from 1974 to 2006, (*id*., p. 1); he was thrown out of school for wearing a skull cap, but whites did not have to remove their hats because it was too cold, (*id*., p. 2); jobs

were given to workers who were not on the board and then leadership would claim that they were on the board, (*id*.); when he arrived at a job, there were workers already there but the job had not been posted, (*id*., p. 3); certain jobs were saved for certain members, (*id*.); he was at the hall, and leadership was not following the procedures, (*id*.); white workers got recalls and black workers did not, (*id*.); the leadership waited for their white friends to come in to the hall before posting a job, or they called their white friends to come pick up a work order, (*id*.); in one meeting, LeBlanc said that he would give "y'all", meaning the black men, a foreman because all he had to do was "give you one", (*id*., p. 4); leadership saved jobs for certain people, (*id.*, p. 5); and the names on the board did not support the call outs, (*id*., p. 7).

Applying the law and analysis as set forth above, Stone has shown a genuine issue of material fact regarding his claims of hostile work environment (i.e., noose, burning cross), disparate treatment, and disparate impact. *See* the Court's analysis of Bell's claims. Defendant's motion is <u>denied</u> as to Stone's claims.

### Earl Turner

Earl Turner testified: blacks are the first to be laid off, (Doc. 737-32, p. 5); all the white men wearing Mason rings were filling out the paperwork for the white workers, and everyone had their ring, (*id*., pp. 17-18); he has had unsafe jobs, (*id*., p. 23); "they" always put us with someone that they thought was a "problem" and they "weaned us out", (*id*., p. 6); they would assign him to an "old guy" which meant he had to do all the work, (*id*.); the "port-o-john" is full of racial slurs, (*id*., p. 14); there was testimony regarding racial slurs and comments made to Turner, but the excerpts of the deposition in the record make what was said unclear, (*id*., pp. 12-13); he identified "recalls" as an example of racial discrimination, (*id*., p. 11); Local 198 appoints the foreman, (*id*., p. 7); Local 198 would not call unions for out of state jobs to line up out of state work for Turner,

they made him just go on his own, (*id*., pp. 7-10); and there is no black representation on any of the boards, (*id*., p. 24).

The record evidence and arguments on summary judgment are inadequate to support the remaining claims of Earl Turner.  There is insufficient evidence supporting Turner's claims and showing that he can meet his burden.  There is no evidence of a genuine issue of fact suitable for trial with regard to Turner's claims.  *See* the Court's analysis of Freddie Jackson's claims.  Based on the applicable law, facts, and record evidence as set forth above, the Court grants Defendant's motion with regard to Earl Turner's claims.  Turner's claims are <u>dismissed with prejudice</u>.

### Alfred Wallace

Alfred Wallace was named as a Plaintiff in the original complaint filed on May 1, 1998. (Doc. 1).  Defendant claims that he filed a charge with the EEOC on August 15, 2001 but does not direct the Court to the charge in the record.  (Doc. 737-2, p. 45).

Wallace testified as follows: he filed suit due to racial discrimination in that he has never been made a foreman or supervisor in twenty-five years, and he has only received one recall, (Doc. 737-33, p. 3); blacks receive inferior job assignments and the dirtiest, hardest jobs, (*id*., pp. 3, 14); racial epithets were used, mostly in the '70's, but never directly at him, and they were on the bathroom walls, (*id*., pp. 15-17); and he called a contractor and asked for a recall, and although he was told that he got the recall, it was never on the board and he did not get it, (*id*., p. 7).

Plaintiffs submitted the Declaration of Alfred Wallace.  (Doc. 770-9).  Wallace declared: that he was a member of Local 198 from 1975 until 2008, (*id*., p. 1); jobs were given to members who were not on the board, (*id*., p. 2); certain jobs were saved for certain members, (*id*.); Local 198 was not following procedure, (*id*.); white workers got jobs and black workers did not, (*id*.); they would wait for their white friends to come to the hall to post, or they would call their white

friends to pick up a work order, (*id*.); recalls were not put on the board, (*id*., p. 3); and the word "nigger" was used at the hall, (*id*.).  The declaration is mostly "form" language from the other declarations utilized and contains little testimony specific to Wallace.

The record evidence and arguments on summary judgment are inadequate to support the claims of Alfred Wallace.  There is insufficient evidence supporting Wallace's claims and showing that he can meet his burden.  There is no evidence of a genuine issue of fact suitable for trial with regard to Wallace's claims.  While there is general evidence and testimony of treatment that may be found to be discriminatory, the evidence is not specific to Wallace and does not rise to the level to meet his burden.  *See* the Court's analysis of Freddie Jackson's claims.  Based on the applicable law, facts, and record evidence as set forth above, the Court grants Defendant's motion with regard to Alfred Wallace's claims.  Wallace's claims are <u>dismissed with prejudice</u>.

### James White

James White was named a Plaintiff in the original complaint filed on May 1, 1998.  (Doc. 1).  White was the subject of Defendant's prior motion on timeliness, and only his claims under state law and Section 1981 remain pending as a result of that ruling.  (Doc. 700).

White testified to the following: blacks were given the dirtier jobs, (Doc. 804-32, pp. 19-21); Michael Kyles was the first man on a job and should have been foreman, but he was laid off and replaced by a white guy instead, (*id*., pp. 24-26); there should have been more black foremen and stewards, (*id*., p. 33); he did not get an out of state job to St. Louis, which paid better than the job he got in Kansas City, (*id*., pp. 8-9); whites got the St. Louis job, and he was discriminated against because he was black and working too much overtime, (*id*., p. 14); he was the subject of practical jokes, just as most apprentices both white and black were, (*id*., pp. 6-7); he witnessed and complained about sexual harassment of Rita Curry, (*id*., p. 10); he heard racial jokes told, (*id*., p.

107

23); and he was called a "nigger" on a job, but it stopped after he confronted the person who said this to him, (*id.*, p. 32).

Plaintiffs offered the Declaration of James White. (Doc. 842-7). White declared: that he filed suit one year after he was released from jail; he was denied a recall after he was released from jail and before he filed suit; white workers got recalls; he saw the names of the persons who got recalls on the screen; and he was denied another recall after filing suit. (*Id.*). Prior to these two recalls, White testified that he had received 10-12 recalls. (*Id.*, p. 27).

Plaintiffs concede that any claims based upon out of town jobs are time-barred. (Doc. 842, p. 16).

Applying the law and analysis as set forth above, White has not sufficiently shown a genuine issue of material fact regarding his claims of hostile work environment, disparate treatment, and disparate impact. While White attested several times to a few instances where blacks were treated differently than whites, he does not relate these instances with specificity in order to meet his burden on his claims. He also does not articulate the facially neutral policy that was administered in a discriminatory fashion in order to have a disparate impact upon him. He does attest to general acts that could be construed by a jury as being discriminatory based on race; however, he does not sufficiently evidence how these instances related to him. *See* the Court's analysis of Freeman's and Freddie Jackson's claims. White's claims are <u>dismissed with prejudice</u>.

### Derrick Wicker

Defendant argues the following without citing to any supporting evidence:

Mr. Wicker alleges that he was put out of the Education program for the stated reason of having poor grades and/or poor attendance. However, he states without specificity that white apprentices who had worse grades and attendance were not treated the same. He eventually completed the training program. He also states he believes he should have been given more credit for his work experience. His

allegations are about a separate entity, the Education Fund, and not about Local 198, and his claims against Local 198 should be dismissed.

(Doc. 737-2, pp. 45-46).

Plaintiffs oppose Defendant's motion and argue that the "Local 198 ran the Apprenticeship School" and "[m]aterial issues of fact preclude summary judgment". (Doc. 770, p. 56). Plaintiffs cite to Wicker's deposition; however, the one page provided did not support the limited argument. (Doc. 770-20).

The Court notes that although Wicker gave his deposition testimony, no party can point to any substantive or supportive evidence of his claims. *See* the Court's analysis of Davis' and Freddie Jackson's claims. Applying the law and analysis as set forth above, Wicker has not sufficiently shown a genuine issue of material fact regarding his claims of hostile work environment, disparate treatment, and disparate impact. Wicker's claims are <u>dismissed with prejudice</u>.

### Tommie Williams[22]

Tommie Williams was a named Plaintiff in the original complaint filed on May 1, 1998. (Doc. 1). Williams was the subject of Defendant's prior motion on timeliness, and only Williams' claims under state law and Section 1981 remain pending as a result of that ruling. (Doc. 700).

Williams testified as follows: in 25 years, he has had one recall, and it was done as a political favor, (Doc. 804-33, p. 29); he trained two white guys how to do a job, and they "passed him by" and were "set up" for foreman, (*id.*, pp. 29-30); blacks are only given the maintenance jobs, no fabrication, (*id.*, p. 31); he was laid off after he bought a car because white people don't want them to have anything nice, (*id.*, p. 33); there were several classes offered, and he was never

---

[22] Mr. Williams' first name is spelled inconsistently throughout the briefing. He is referred to as "Tommy" and "Tommie". The Court utilizes the spelling most often utilized by Plaintiffs' counsel, "Tommie".

contacted about them, (*id.*, p. 11); he was told that he would be called about the classes, but he never was, (*id.*, pp. 10-14); he has been called "nigger", heard racial slurs, and has seen nooses, (*id.*, p. 22); he has seen nooses on every job that he has been on, (*id.*, p. 28); Williams was not allowed to work a non-union job, but white members were, (Doc. 827-15, p. 2); Williams has been on the list many times, but it is "nothing but white recalls", (*id.*, p. 5); and when Williams was trying to obtain back pay from a contractor, counsel for Local 198 told him to go get his black lawyer, (*id.*, pp. 15-16).

Defendant argues that all of Williams' complaints are "under the aegis of the company". (Doc. 833, p. 15).  However, as cited above from Williams' deposition, he identifies LeBlanc and Local 198 leadership.

Applying the law and analysis as set forth above, Williams has shown a genuine issue of material fact regarding his claims of hostile work environment (i.e., nooses on every site), disparate treatment, and disparate impact.  *See* the Court's analysis of Bell's claims.  Defendant's motion is denied as to Williams' claims.

### E.    Miscellaneous Issues

#### 1.    The Education Fund is a Separate Entity.

One of the grounds of Defendant's Motion is that Local 198 is not responsible for the actions or inactions of the Education Fund (the apprenticeship program).  (Doc. 737-2, p. 11). Defendant argues that the Education Fund is a separate and distinct entity from Local 198; therefore, one entity is not liable for the actions or inactions of the other.  (*Id.*, p. 12).  The record reflects competent summary judgment evidence supporting the fact that the Education Fund and Local 198 are separate entities.  (Doc. 737-4; Doc. 737-7).

While Defendant argues that because the Education Fund is a separate and distinct entity from Local 198 and the Local 198 cannot be liable for the fault of the Education Fund, Defendant cites to no legal authority to support this premise. Although the Court generally agrees with this basic premise, the Court rules as follows.

First, Defendant raised the issue of whether Local 198 can be found liable for the fault of the Education Fund when Local 198 is a separate and distinct entity. Plaintiffs do not dispute this general point. Plaintiffs dispute Defendant's argument on the grounds that the roles of the actors were so intertwined that Local 198 was effectively running the apprenticeship program. At a minimum, Plaintiffs argue that there are genuine issues of material fact as to who was acting in what capacity on which entity's behalf, thus preventing summary judgment on this issue. (Doc. 770, pp. 17, 19-20).

However, even though it is undisputed that Local 198 and the Education Fund are two separate and distinct entities and that Local 198 is not liable for any fault of the Education Fund, both parties have introduced evidence that creates a genuine issue of material fact as to whether the wrongful conduct complained of by Plaintiffs was committed by the Education Fund or Local 198's employees or agents acting on behalf of Local of Local 198. For example, many Plaintiffs testified that members of Local 198 acted in a discriminatory manner when the Plaintiff was engaged in training in the apprenticeship program. The question then becomes whether that member was acting on behalf of Local 198, the Education Fund, both, or neither. That same question cannot be answered with certainty based on the current record on summary judgment. Genuine issues of material fact on this issue preclude summary judgment.

## 2.    Local 198's Responsibility for its Members

Defendant asserts that the likely reason that "the plaintiffs believe Local 198 [is] liable for actions taken by the Education Fund" is "because some Union members sit on its Board of Trustees or are employed by the Education Fund as instructors". (Doc. 737-2, p. 13). Defendant then argues that Local 198 "is not liable for everything that its individual members do". (*Id*.). Defendant argues that Plaintiffs must show that the Local 198 "participated in, authorized, or ratified those acts" of the member for whom Plaintiffs seek to hold Local 198 responsible. (*Id*., citing *Willis v. Letulle*, 597 So.2d 456, 477 (La.App. 2 Cir. 1992)). Because Plaintiffs do not make this showing, Defendant contends that their claims "must" be dismissed.

Plaintiffs respond to Defendant's argument that it is not liable for the unauthorized acts of union members just as they do to the preceding argument regarding the Education Fund. Plaintiffs cite to various affidavits and deposition excerpts to purportedly show that "discriminatory acts were being taken by the Local 198 leadership". (*Id.*, p. 20). The question that Plaintiffs raise is whether the "discriminatory acts" were exercised in an individual's capacity as a member or as a leader of Local 198? Again, the record is unclear.

The Court has reviewed the extensive briefing and record evidence in this matter. It is unclear which specific members of Local 198 (other than Louis LeBlanc and Sammy Graphia) have been identified by Plaintiffs – by name and/or as acting in a capacity other than for Local 198. The vast majority of Plaintiffs testified in terms of "Local 198", except in those instances where the Plaintiff specifically "pointed the finger" at LeBlanc or Graphia. It is likewise unclear as to what hat LeBlanc, Graphia, or any other un-named Local 198 representative was wearing with regard to each Plaintiff's complaints. The Court is unable to discern if a specific member's actions were specifically authorized by Local 198 or not, and whether it serves to secure summary

112

judgment.  Defendant has failed in its burden to show that there is no issue of material fact as to whether the wrongful conduct complained of was committed by or on behalf of Local 198. At a minimum, there are issues of fact as to this issue on the current record precluding summary judgment.

### 3.    Local 198's Liability for Employers and their Agents

Defendant accurately argues that many "[P]laintiffs complain about being treated more adversely than whites in the workplace", but that these complaints may be more appropriately directed at the contractor/employer, rather than Local 198.  It was the contractor/employer who had control of the work site and its conditions, not Local 198.  (Doc. 737-2, pp. 13-14).  Defendant argues that based upon the terms of the collective bargaining agreements in place, Local 198 is not responsible for "everything related to the workplace, and the Union does not appoint supervisors, make work assignments or decide layoffs; rather these are management functions and are reserved to the employer".  (*Id.*, p. 14).  However, as is set forth above, Plaintiff after Plaintiff has testified that Local 198 did, in fact, appoint the foremen, supervisors, and stewards; that Local 198 did not follow the procedures in place; that Local 198 controlled which members received job assignments, and which did not.  Plaintiffs do not disagree with the terms of the collective bargaining agreements in place.  Rather, Plaintiffs are arguing that Local 198 acted in disregard of those contract provisions to the detriment of African American members of Local 198.  The Plaintiffs clearly point to Local 198 in this regard, not the contractor.  Again, at a minimum, genuine issues of fact exist to defeat summary judgment on these grounds.

### 4.    Claims of Negligence under Louisiana State Law

As stated in the introduction of this ruling, Defendant's motions seek to dismiss Plaintiffs' claims of racial discrimination and a hostile work environment under Title VII, state law, and

Section 1981.  Defendant's briefing makes no mention of Plaintiffs' claims of negligence under state law.  Defendant has failed to point this Court to any portion of this 20-year-old record where the issue of Plaintiff's state law claims has been addressed or resolved. "The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal." *JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (quoting *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n.10 (S.D. Tex. 2003) (citations omitted)); *see also United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation ... is a failure to brief and constitutes waiver"). "By analogy, failure to brief an argument in the district court waives that argument in that court. " *JMCB*, 336 F. Supp. 3d at 634 (quoting *Magee*, 261 F. Supp. 2d at 748 n.10).

For this reason, Defendant's motions for summary judgment with regard to Plaintiffs' claims of negligence under state law are denied.

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that *Defendant United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO, Local 198's Motions for Summary Judgment,* (Docs. 737 and 804), are **GRANTED in part and DENIED in part**.

**IT IS ORDERED** that *Plaintiffs' Motion to Strike*, (Doc. 793), is **DENIED**.

Signed in Baton Rouge, Louisiana, on June 29, 2020.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**